1        IN THE UNITED STATES BANKRUPTCY COURT

2           SOUTHERN DISTRICT OF TEXAS

3              HOUSTON DIVISION

4
IN RE:                    §      CASE NO. 05-91470-H1-7
5                         §      HOUSTON, TEXAS
GEORGE R. COUNCILL and    §
6   JANET COUNCILL,       §      THURSDAY,
                          §      OCTOBER 7, 2010
7      DEBTORS.           §      2:02 P.M. TO 4:57 P.M.

8
                   APPLICATION TO COMPROMISE
9
              BEFORE THE HONORABLE MARVIN ISGUR
10             UNITED STATES BANKRUPTCY JUDGE

11
                      APPEARANCES:
12
           FOR DEBTOR:        SEE NEXT PAGE
13
           COURT RECORDER:    BRENT LASWELL
14
           COURT CLERK:       MS. TEZENO
15

16

17

18

19

20                    PREPARED BY:

21        JUDICIAL TRANSCRIBERS OF TEXAS, INC.
                   P.O. Box 925675
22             Houston, Texas 77292-5675
           Tel: 281-328-6179 ▼ Fax: 281-462-2016
23             www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

2

1                          APPEARANCES:

2

   FOR THE DEBTORS,
3  GEORGE AND JANET COUNCILL:      CHRISTOPHER BECK, ESQ.
                                   BAKER BECK PC
4                                  202 AVENUE A
                                   CONROE, TX  77301
5                                  936-494-2444

6

    FOR AMWAY CORPORATION:          JOHN SPARACINO, ESQ.
7                                   ANDREWS KURTH LLP
                                    600 TRAVIS, SUITE 4200
8                                   HOUSTON, TX  77002
                                    713-220-3810
9

10  FOR BROCK AKERS:                CRAIG COWGILL, ESQ.
                                    COWGILL & ASSOCIATES, P.C.
11                                  8100 WASHINGTON AVENUE
                                    SUITE 120
12                                  HOUSTON, TX  77007-1055
                                    713-956-0254
13

    CHAPTER 7 TRUSTEE:              WILLIAM G. WEST, ESQ.
14                                  12345 JONES ROAD
                                    SUITE 120
15                                  HOUSTON, TX  77070
                                    281-807-7811
16

    FOR CHAPTER 7 TRUSTEE:          DAVID R. JONES, ESQ.
17                                  PORTER & HEDGES, LLP
                                    1000 MAIN STREET
18                                  36TH FLOOR
                                    HOUSTON, TX  77002-6336
19                                  713-226-6653

20

21

22

23

24

25

                    JUDICIAL TRANSCRIBERS OF TEXAS, INC.

1                          INDEX

2

3    WITNESS:              Direct      Cross      Redirect      Recross

4    WILLIAM WEST, TRUSTEE
       By Mr. Jones      16
5      By Mr. Sparacino  .           59            .            .
       By Mr. Beck       .           61            .            .
6

7

8    EXHIBITS:                     Marked      Offered      Received

9    Debtor's Exhibits
        Numbers 1 through 4          7           7            8
10   Debtor's Exhibit Number 5      7           7            x

11   Trustee's Exhibits
        Numbers 1 through 11        7           7            8
12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1        **HOUSTON, TEXAS; FRIDAY, FEBRUARY 16, 2007; 8:42 A.M.**

2            **THE COURT:**  All right, we have the George and

3    Janet Councill case.  It's 05-91470.  We'll take appearances

4    here in court.  I don't think we have anyone on the

5    telephone.

6            **MR. SPARACINO:**  Good afternoon, Your Honor, John

7    Sparacino for Amway Corporation.

8            **MR. COWGILL:**  Good afternoon, Your Honor, Craig

9    Cowgill.  I've been associated with Brock Akers.

10               David Jones is here on behalf of the moving

11   parties, but my understanding is that he is in court with

12   Judge Bohm and if you will excuse me, I will run up and see

13   where he is or what the status is.

14           **MR. SPARACINO:**  Yes, Your Honor, I believe at 1:30

15   with Judge Bohm and didn't believe it was going to take very

16   long.

17           **THE COURT:**  All right.  Yes, sir.

18           **MR. BECK:**  Christopher Beck here on behalf of the

19   Debtor, Your Honor.

20           **THE COURT:**  All right.  Any other appearances?

21           **MR. AKERS:**  I'm Brock Akers.

22           **THE COURT:**  Do you want me to wait for Mr. Jones

23   or do you-all want to proceed without him?

24           **MR. COWGILL:**  Let me run up and see --

25           **MR. BECK:**  We've got no problem with that, Judge.

1          **MR. COWGILL:**  -- where he is.  I think we'd like

2  to wait for him.

3          **MR. BECK:**  Yes.

4          **MR. COWGILL:**  But I need to go -- it would

5  probably be better for me to go check and see where he is.

6          **MR. SPARACINO:**  Yes, Your Honor.  He is counsel

7  for the Movant, so I would prefer we wait.

8          **THE COURT:**  Why don't you-all just hold on a

9  second.  You-all can sit down.

10          **MR. BECK:**  Thank you, Judge.

11          **MR. COWGILL:**  He's calling?

12          **MR. SPARACINO:**  Judge is calling.

13      **(Pause.)**

14          **THE COURT:**  Judge Bohm's law clerk reports that

15  he's making his ruling now, so I don't see much reason to go

16  retrieve him when I assume that Mr. Jones will be here as

17  soon as Judge Bohm finishes the ruling and we'll recommence

18  the hearing at that point.

19              This is the last hearing I have set for

20  today.  I do have to be somewhere tonight at 6:00.  I'm not

21  sure how long we'll be, but I suspect that that will be

22  plenty of time to get it done, even if we have to wait for

23  him.  So I'll just return as soon as he gets here if you

24  will let Ms. Tezeno know and we'll start at that point.

25              Thank you.

1      **THE CLERK:**  All rise.

2      **(Recess taken from 2:05 p.m. to 2:34 p.m.)**

3      **THE COURT:**  Mr. Jones, did you want to make your

4  appearance, please?

5      **MR. JONES:**  Yes Judge, good afternoon.  David

6  Jones, J-o-n-e-s, on behalf of William West, the Chapter 7

7  Trustee in the case.  And again, Judge, I apologize for

8  getting stuck in Judge Bohm's court.

9      **THE COURT:**  It took me longer to get out than

10  expected because I had to stay on the phone with Judge Bohm

11  apologizing that he kept you.  So I think it's okay.

12      **MR. BECK:**  Christopher Beck, B-e-c-k, on behalf of

13  the Debtor.

14      **THE COURT:**  Thank you, Mr. Beck.

15           All right.  What kind of evidence are we

16  going to have today in the way of documentary evidence?

17      **MR. JONES:**  Judge, the Trustee had eleven

18  exhibits.  They should have been delivered to chambers.

19  Counsel has a copy delivered yesterday as well.

20      **THE COURT:**  Mr. Beck, which of those do you have

21  objections to?

22      **MR. BECK:**  Judge, I've reviewed the exhibits that

23  he's provided.  I actually don't have objections to any of

24  the exhibits that he's got.

25           We've provided them with five exhibits that

1 we have.  I've got a copy for the court here, I didn't have

2 those --

3          **THE COURT:**  All right, let me see yours.  Thank

4 you.

5               Mr. Jones, which of his five exhibits do you

6 have objections to?

7          **MR. JONES:**  Judge, Exhibit Number 5 and it's

8 simply because I don't understand what it is.

9          **THE COURT:**  All right.  Mr. Sparacino, which

10 objections do you have to any, either side's exhibits?

11          **MR. SPARACINO:**  Your Honor, I have no objection to

12 any of Mr. Jones' exhibits.

13          **THE COURT:**  Okay.

14          **MR. BECK:**  May I approach the bench?

15          **THE COURT:**  Yes, sir.

16          **MR. SPARACINO:**  I have no independent objection to

17 any of Mr. Beck's exhibits.  I also have exhibits that I've

18 filed, the Witness and Exhibit List -- the Amended Witness

19 and Exhibit List.

20               Frankly, Your Honor, I believe I'm going to

21 use those only in cross-examination and I don't think I'm

22 going to move to admit any of exhibits in my exhibit book.

23          **THE COURT:**  All right.  I'm going to admit the

24 Trustee's 1 to 5.  I'm going to admit Mr. Beck's 1 to 4.

25 I'll let him offer Number 5 during the course of the hearing

1  and tell me what it's about.  Then we'll listen to

2  Mr. Jones' objection at that point.

3            So 1 to 4 admitted by Mr. Councill; 1 to 11

4  by the Trustee.

5      **(Debtor's Exhibits Numbers 1 through 4 and Trustee's**

6  **Exhibits Numbers 1 through 11 received in evidence.)**

7       **THE COURT:**  I have a question before we begin.

8  The proposed form of Order by the Trustee has a provision in

9  paragraph 7 that settles any claims that have been or could

10 be asserted by the Debtors, as opposed, in addition to

11 another laundry list of folks.

12            Having read Mr. Councill's objection, I'm

13 trying to figure out to the extent that there are post-

14 petition claims that are owned -- because they arose post-

15 petition, owned by the Councill's, is the Trustee attempting

16 to Order that those are released as well or only that the

17 Debtor's pre-petition rights are being released because they

18 emerged into the estate?

19      **MR. JONES:**  That's exactly right, Your Honor.  If

20 there is a claim, and so nobody is taken aback by this, we

21 don't believe there can be.

22       **THE COURT:**  I understand that.

23      **MR. JONES:**  But no, we are not trying to resolve

24 any post-petition claim that might be owned by the Debtor or

25 quite frankly anybody else.

1          **THE COURT:**  So, if Mr. Councill, just so that

2  we -- I want to beat this a little bit to death because I

3  want to be sure that at least part of the dispute raised by

4  Mr. Beck is resolved right up front, which is that this

5  Order will not say that Mr. Councill's post-petition claims,

6  if they exist, and I'm not saying they do, are being

7  released, even if we approve this, only his pre-petition

8  claims that became part of the estate.

9          **MR. JONES:**  Judge, I don't have the ability to do

10  that.  And I'm not trying to do that.

11          **THE COURT:**  Okay.  And so to the extent this

12  language might be read that way, you're agreeing we have to

13  fix the language?

14          **MR. JONES:**  I don't -- well, in the context --

15          **THE COURT:**  I think it --

16          **MR. JONES:**  -- I don't see how you can read it

17  that way, but no we are not trying to settle any post-

18  petition claims owned by the post-petition Debtor.

19          **THE COURT:**  And do you agree that your settlement

20  with the Trustee, if it's approved, does not include a

21  release of claims by Mr. Councill that arose after the day

22  of the petition?

23          **MR. SPARACINO:**  I'm going to give you a long-

24  winded answer to that.

25          **THE COURT:**  I suspect.  Because I think it's a

1    hard question.  I just want to be sure we define it right.

2          **MR. SPARACINO:**  Understand.  This was a three-day

3    mediation, a heavily negotiated Settlement Agreement, a

4    heavily negotiated form of Order, among a number of

5    Defendants and their carriers, including my client Amway --

6    highly negotiated.  The parties believed that one of the

7    claims that was among the claims being resolved was this

8    assertion by Mr. Councill that he's entitled to bonuses

9    post-petition.

10          The parties believed that those claims were

11   property of the bankruptcy estate and as such, those claims

12   were among the claims that the Trustee owned, had control of

13   and could settle and resolve and is settling and resolving

14   today.  It's frankly -- as I stand here today, it's

15   unacceptable to my client to water that protection down and

16   to leave my client with the prospect that tomorrow it's

17   going to face a lawsuit filed by Mr. Councill to recover

18   post-petition bonus amounts.

19          So to the extent the Councill's believe that

20   they have this right, that this claim is not an estate

21   claim --

22          **THE COURT:**  Let me tell you what I'm contemplating

23   doing and I'll hear -- this is assuming we approve it and we

24   haven't even gotten to that state.  But I don't want to

25   start off the hearing not even knowing -- I want everybody

1    to know the maximum that I'm willing to do if the evidence

2    approves it, is to cross-out the word "Debtors" from

3    Paragraph 7, but to include a new paragraph X that says,

4    "All persons, including the Debtors, are enjoined from

5    prosecuting any claims of the estate that have been

6    released," which would then bar them from bringing that

7    claim if the Trustee owns it.  But it wouldn't stop them

8    from bringing their own claims.

9          In all likelihood that means at some point,

10    we going to have to figure out, if they want to pursue this

11    and if we approve this, who owns that claim.  And maybe

12    today is the day to decide who owns that claim.  But that

13    may come on down the road.

14          When -- if Mr. Councill decides to prosecute

15    a claim against Amway, if this approved or you can call

16    Amway, whatever the settling --

17         **MR. JONES:**  We call them the "Amway Entities."

18         **THE COURT:**  -- the "Settling Defendant."

19         **MR. SPARACINO:**  And believe me Your Honor, there

20    not all Amway, there is discord among the ranks of

21    Defendants, as well.

22         **THE COURT:**  I think that the particular claim of

23    post-petition distributions --

24         **MR. SPARACINO:**  That's correct.

25         **THE COURT:**  -- if he decides to bring that, we'll

1    have to decide either today or at a future date whether that

2    would be encompassed within the injunctive relief.

3             But what I don't want is to later decide that

4    this Order said Debtors and therefore, it included anything

5    that he might own post-petition.  I don't think that's fair.

6    But to say, I mean they can't bring claims that belong to

7    the estate.  That would be an estate violation by them.

8    They can't bring it if we were to release them.  That would

9    violate our Order, because I'm going to enjoin it.

10            But they may own them and either today or in

11   the future when they decide to bring them, we're going to

12   have to resolve that.  And I want to figure out if that at

13   least resolves that objection and if that -- assuming that

14   does resolve that objection, if Amway would proceed with the

15   deal with that, because I am not going to release, force

16   them to release something that they own that the estate

17   doesn't own.

18            **MR. BECK:**  Yes, Your Honor.  And by response, Your

19   Honor, I think you've hit upon what was probably the third

20   pillar of our objection and that is that, if you recall, the

21   underlying bankruptcy case at the beginning it was an

22   advisory proceeding filed because my client received a 1099

23   for payments that were supposedly paid to him after the

24   filing of the petition by Amway, from the Amway Defendants.

25            The 1099 came from a Defendant saying that

1   this was paid to you and you now have to pay taxes on it.

2   However, the money was held up in offset against the

3   judgment, which, of course, is no longer in existence.

4              So because the payments became due and

5   payable on a monthly basis post-petition was our basis of

6   our claim there that these are improper set-offs that belong

7   to the Debtors.  And so that is our contention on that

8   pillar of our objection.

9        **THE COURT:**  Right, but I think, and I don't want

10  anybody mislead by this because I have not reached a

11  conclusion.

12       **MR. BECK:**  Understood.

13       **THE COURT:**  I think there is a good faith argument

14  at a minimum.

15       **MR. BECK:**  And that's what we're asking with our

16  objection here, is that we still be allowed to bring that in

17  the future if they decide to.

18       **THE COURT:**  I think there is a good faith argument

19  that the post-petition royalties, if earned from

20  pre-petition work, became property of the estate when the

21  petition was filed and therefore are the Trustees to settle.

22  I'm not planning to reach that conclusion today, but it's

23  certainly a non-frivolous argument by the Trustee and by the

24  settling Defendants that your client doesn't own that even

25  if he got 1099.

1          Now if the issuance of the 1099 itself

2    created damage, you know, best guess is he does own that,

3    but that's different than saying he necessarily owns the

4    royalties themselves.  And all I'm telling you is, I'll

5    probably preserve that today and I want to know if it

6    resolves that part of the dispute.

7          **MR. BECK:**  It does, Judge, I'm not asking you to

8    make a decision on whether or not they have a claim, just

9    that if they have one, they are free to bring it.

10          **THE COURT:**  And would Amway still settle if I do

11    that?  Because I'm telling that's pretty much the most I'm

12    going to do and the language can be worked on, but --

13          **MR. SPARACINO:**  I understand, Your Honor.  I

14    unfortunately don't have authority today to say that Amway

15    would agree to any changes to the form of the Order, number

16    one.  And number two again, I'd note, that there are other

17    Defendants, including carriers, involved, as well, that

18    might have to weigh in on that issue, so --

19          **THE COURT:**  As their lawyer, what's your objection

20    to that provision in terms of being in conformance with the

21    law?

22          **MR. SPARACINO:**  I understand that that is a

23    statement, a correct statement of the law.

24          **THE COURT:**  Okay, so I'd have to do that and if we

25    approve it, that change will be here; therefore, I really

1    don't need to hear evidence or argument on that unless the

2    parties agree they want to resolve today, who owns that

3    claim, which I doubt people are completely prepared to do.

4         **MR. BECK:**  We weren't prepared to do that directly

5    today.

6         **THE COURT:**  So I'm inclined just to preserve it

7    for a future revision and allow you -- probably when we

8    craft the injunction language to allow you to come in for a

9    declaration.

10        **MR. SPARACINO:**  Your Honor, I'll note that I was

11   certainly prepared today through cross-examination to point

12   out where Mr. Councill has admitted a number of times under

13   oath that he provided no services post-bankruptcy.  And so

14   the 541(a)(6) exception would not be applicable here.

15        **THE COURT:**  Yeah, but let's assume that you sent

16   him a 1099 and that he had to pay taxes based on the 1099

17   that you sent him.

18        **MR. SPARACINO:**  Well, the 1099 was withdrawn.

19        **THE COURT:**  Yeah, but I don't know what happens

20   between, I just don't know what happens between the date you

21   sent it and the date he gets it, but seems like if you sent

22   him a 1099 that you shouldn't sent him and you didn't send a

23   1099 to the estate but you sent it to him, there might be an

24   issue there.  And if there is, I don't think I can resolve

25   it without his consent.

1          Okay, well then I'm basically telling you-all

2     how I'm going to resolve that one, to try and streamline the

3     hearing.  That assumes I'm going to approve everything and I

4     know that we're a long way from doing that, but I don't want

5     to waste a lot of time at the hearing on issues that we

6     don't need to spend.

7          So who is going to be your first witness,

8     Mr. Jones?

9          **MR. JONES:**  The Trustee.

10         **THE COURT:**  Mr. West, will you come forward

11    please?  Mr. West, would you raise your right hand, sir?

12    **(Witness sworn.)**

13         **THE COURT**:  Mr. Jones, give me a minute to get my

14    computer arranged.

15              All right.

16         **MR. JONES:**  May I proceed, Judge?

17         **THE COURT:**  Yes, sir.

18         **DIRECT EXAMINATION OF WILLIAM WEST**

19    **BY MR. JONES:**

20    Q    Mr. West, will you state your name for the record,

21    please?

22    A    William George West, Jr.

23    Q    And what is your relationship to this bankruptcy case?

24    A    I'm the Chapter 7 Bankruptcy Trustee.

25    Q    Now, Mr. West, you are today seeking a settlement of

1  all of the estate's claims against what I am going to call

2  the "Amway Entities" and we'll identify those in a second.

3  But is that a fair statement?

4  A    Yes.

5  Q    All right.  Could you tell the Judge just briefly the

6  context under which this settlement was reached?

7  A    There was a three-day mediation in May, which led to

8  this settlement.

9  Q    Correct.  Did you personally attend that mediation?

10 A    Yes.

11 Q    Did you participate in the negotiations back and forth?

12 A    Yes.

13 Q    Were you there both with your special litigation

14 counsel as well as you bankruptcy counsel?

15 A    Yes.

16 Q    All right.  Now, Mr. West, I'd like for you to turn to

17 Exhibit 7.

18 A    Yes.

19 Q    This has been admitted.  Is this a copy of the

20 Settlement Agreement that was derived out of the mediation?

21 A    Yes.

22 Q    All right.  Now I want to go through this very briefly.

23        **MR. JONES:**  Judge, I'm mindful of what you said

24 about the -- about the claim issue.

25 **BY MR. JONES:**

WILLIAM WEST -- DIRECT BY MR. JONES                    18

1  Q    But just very briefly the list of Plaintiffs, those are

2  the parties that are providing the releases, correct?

3  A    Yes.

4  Q    And Mr. Councill is not one of those parties; is that

5  correct?

6  A    Correct.

7  Q    All right.  Now, Mr. West, you're actually in there as

8  the Chapter 7 Trustee for two different cases, correct?

9  A    Yes.

10 Q    And the other case is the _Kitia_ (phonetic) case.

11 A    Yes.

12 Q    And that settlement has been approved?

13 A    Yes.

14 Q    All right.  With that Mr. West, just briefly, let's

15 turn over to page 4 of the settlement.  Under paragraph 6,

16 if you just read along with me, it says:

17      "This Settlement Agreement is subject to review and

18      approval" by each bankruptcy -- I'm sorry, "by each

19      United States Bankruptcy Court having jurisdiction over

20      each Trustee Plaintiff's bankruptcy case."

21          Did I read that correctly?

22 A    Yes.

23 Q    All right.  How many cases are pending in which a

24 Motion to Compromise was filed?

25 A    Thirteen.

1  Q     All right.  And to date, how many have been approved?

2  A     Eight.

3  Q     Have any been denied?

4  A     Not to my knowledge.

5  Q     Now, Mr. West, if you turn back to page one of

6  Exhibit 7?  Are you there?

7  A     Yes.

8  Q     All right.  And down under "Defendants," there are a

9  list of parties.  Do you see that?

10 A     Yes.

11 Q     Under the term "Defendants"?

12 A     Yes.

13 Q     And those are the Amway parties to whom you are

14 receiving compensation and you are granting a release; is

15 that correct?

16 A     Yes.

17 Q     All right.  Now, Mr. West, if you would turn over to

18 page three of ten of Exhibit 7?

19 A     Yes.

20 Q     Under paragraph five, there is a chart that sets forth

21 whose going to get what, correct?

22 A     Yes.

23 Q     All right.  And under the proposed settlement how much

24 is the Councill bankruptcy estate going to receive?

25 A     $426,410.69.

1   Q    All right.  Now, Mr. West, if you could very briefly

2   for the Judge, explain the process by which you evaluated

3   this number and how this number was arrived at.

4   A    Before the mediation, the Trustees had gotten together

5   and had asked special counsel to provide a listing or a

6   weighting of what he believed the values of the cases to be.

7   Q    Correct.  And did you use that weighting in order to

8   establish the relative priority of one claim against another

9   between the various Trustees?

10  A    Yes.

11  Q    All right.  And so, when a particular offer was made

12  did you then take that weight and figure out how much your

13  separate estate would get?

14  A    Yes.

15  Q    All right.  Then what did you do with that number?  Did

16  you have further conversations?

17  A    Yes.

18  Q    Did you have those with Mr. Akers, or did you have

19  those with your bankruptcy counsel?

20  A    Both.

21  Q    And what did you attempt to do with that number?

22  A    To compare it to the claims made in the case.

23  Q    All right.  Now, Mr. West, I'd like for you to turn to

24  Exhibit 1.  This has been admitted.

25  A    Yes.

1  Q     This is a pleading filed by Amway Corporation and

2  Quixtar in advisory proceeding 06-3501 before this Court,

3  correct?

4  A     Yes.

5  Q     All right.  Now, if, first of all, let me ask why did

6  you pick this document?

7  A     Because of the -- this particular document had good

8  clear copies in the exhibits.

9  Q     Okay.  All right.  So let's look at Exhibit A to

10  Exhibit 1.

11  A     All right.

12  Q     Up at the top it says, "Amway Distributor Application

13  (Authorization and Contract)"?

14  A     Yes.

15  Q     All right.  Is -- and can we agree that this is the

16  "Amway Agreement," if you will?

17  A     Yes.

18  Q     Now if you look about two-thirds or three-quarters down

19  the page, when was this document executed?

20  A     April 9, 1989.

21  Q     Okay.  By both Debtors?

22  A     Correct.

23  Q     All right.  Now let's look over at Exhibit C to

24  Exhibit 1.  And is this what you refer to as the "Quixtar

25  Agreement"?

WILLIAM WEST -- DIRECT BY MR. JONES                    22

1    A    Yes.

2    Q    What is the date of this agreement?

3    A    October 27, 1999.

4    Q    And if you would turn over to Exhibit D of Exhibit 1,

5    is this the "Quixtar Biz Reference Guide"?

6    A    Yes.

7    Q    Is this the document that sets forth all the rules and

8    regulations regarding the Quixtar business?

9    A    That's my understanding.

10   Q    All right.  Now, Mr. West, you've had copies of these

11   three documents since early on in your administration of the

12   case, correct?

13   A    Yes.

14   Q    All right.  And have you based your -- number one have

15   you read these documents?

16   A    Yes.

17   Q    All right.  Have you had the chance to review the

18   documents with Counsel?

19   A    Yes.

20   Q    And Mr. West, have you made your decision in this case

21   based in part upon your determination that these are the

22   operative documents?

23   A    Yes.

24   Q    Now, Mr. West, when was the bankruptcy case filed?

25   A    October 14, 2005.

1    Q    Do you remember what day October 14, 2005 was?

2    A    It was a Friday.

3    Q    Are you able to do that for any date or what?  What was

4    special about that day?

5    A    It was the Friday before the law changed on the

6    following Monday.

7    Q    Gotcha.  So both the Quixtar Agreement and the Amway

8    Agreement are all pre-petition agreements, correct?

9    A    Correct.

10   Q    Now, Mr. West, let's look at Trustee Exhibit 2.

11   A    Yes.

12   Q    That's a copy of the petition that created this case,

13   correct?

14   A    Yes.

15   Q    All right.  And if you look at page two, signed under

16   penalty of perjury by Mr. and Ms. Councill, actually by

17   Mr. Councill and by Ms. Councill with permission by Mr.

18   Beck; is that correct?

19   A    Correct.

20   Q    All right.  Now let's look at page one.

21   A    All right.

22   Q    About three-quarters of the way down, you see the box

23   that says "statistical/administrative information estimates

24   only"?

25   A    Yes.

1    Q    Would you read the box that is checked?

2    A    "Debtor estimates that after any exempt properties

3         excluded and administrative expenses paid, there will

4         be no funds available for distribution to unsecured

5         creditors."

6    Q    All right.  And if we go down two boxes to the

7    "estimated asset box," would you read the value of the

8    assets that the Debtor under penalty of perjury told this

9    court and the world as to what his assets were worth?

10   A    "$50,001 to $100,000."

11   Q    Now, Mr. West, did you consider the Debtor's statement

12   under penalty and perjury in making your decision to accept

13   the settlement that you are asking the court to approve?

14   A    Yes.

15   Q    All right.  Now, let's turn over to Trustee Exhibit 3.

16   A    Yes.

17   Q    These are the Bankruptcy Schedules, are they not?

18   A    Yes.

19   Q    Now, Mr. West, I want you to look at Schedule B and I

20   want you to tell me where the Debtor listed an Amway

21   contract, a Quixtar contract, anything sort of Amway-related

22   agreement.

23   A    I didn't see one listed.

24   Q    All right.  I want you to look at Exhibit -- I'm sorry,

25   I want you to look at Schedule G, Executory Contracts.

1          **THE COURT:**  Mr. West, what about Block 20 on

2    Schedule G?

3          **MR. JONES:**  Judge, I'm going to come back to that.

4    It's not a contract.

5          **THE COURT:**  The breach of contract claim --

6          **MR. JONES:**  It's a claim.

7          **THE COURT:**  -- I want a clear record on this and

8    he lists the breach of contract claim and to say that he

9    doesn't even describe an Amway contract claim --

10         **MR. JONES:**  No, that's not what I asked him,

11   Judge.  I said a contract and there is a difference between

12   a contract and a claim.

13         **THE COURT:**  There maybe a difference, but what did

14   you do with that, Mr. West?  Did you notice Item 20?

15         **THE WITNESS:**  Yes, sir.

16   **BY MR. JONES:**

17   Q    Now, Mr. West, looking at Schedule G, Executory

18   Contracts, is there any mention or reference by the Debtor

19   to a Quixtar Agreement or an Amway agreement or any

20   agreement related to Amway?

21   A    No.

22   Q    All right and Mr. West, did you consider those

23   omissions in making your decision to go forward with the

24   proposed settlement?

25   A    Yes.

WILLIAM WEST -- DIRECT BY MR. JONES                    26

1  Q     Now, the Judge just pointed you to question 20 and

2  let's deal with that.  Question 20:  "There is a breach of

3  contract claim and other causes of action against Amway and

4  other Defendants in Case Number H-98-0352."

5               Did I read that correctly?

6  A     Yes.

7  Q     And the Debtor valued that claim $6,710,619.00,

8  correct?

9  A     Yes, correct.

10 Q     Now, Mr. West, does that statement conflict with the

11 Debtors' statement on his petition?

12 A     Yes.

13 Q     And did you consider that fact in deciding whether or

14 not to accept the settlement and go forward today?

15 A     Yes.

16 Q     All right.  Now, Mr. West, the Debtor filed amended

17 schedules in this case, correct?

18 A     Yes.

19 Q     Let's turn to Exhibit 5.

20 A     All right.

21 Q     These are the first amended schedules?

22 A     Yes.

23 Q     And except for the breach of contract claim at

24 Question 20, is there any reference to the existence of a

25 Quixtar Agreement or an Amway Agreement on the petition

1   date?

2   A     No.

3   Q     Now, in fact the changes to the amended schedules, if

4   you'll turn to Question 12, is that the Debtor listed

5   100,000 shares of Telegistics, correct?

6   A     Yes.

7   Q     All right.  And that hadn't previously been disclosed,

8   correct?

9   A     Correct.

10  Q     Have you received that stock?

11  A     No.

12  Q     Have you considered that fact in evaluating the

13  credibility of the Debtor?

14  A     Yes.

15  Q     Now, Mr. West, there's also an accounts receivable

16  listing that says, "Amway business monthly bonus that

17  averaged about $2100 a month, this has not been received in

18  over a year, but the Debtor believes it is still owed with a

19  value of zero."

20                    Is that correct?

21  A     Yes.

22  Q     And this was property that the Debtor listed and stated

23  existed as of the time of the bankruptcy, correct?

24  A     Yes.

25  Q     All right.  Now, Mr. West, let's turn back to

1   Exhibit 4.  That is the Debtor's Statement of Financial

2   Affairs; is that correct?

3   A     Yes.

4   Q     All right.  Let's look at Question 1.  In Question 1,

5   the Debtor listed income in 2003 and 2004, the two years

6   preceding the case, a little over $150,000 a year; is that

7   correct?

8   A     Yes.

9   Q     And did you consider that fact in making the decision

10  to go forward with proposed settlement?

11  A     Yes.

12  Q     Why was that important to you?

13  A     Related to mitigation.

14  Q     Okay.  In fact in 2005 there's $121,982 reported; is

15  that correct?

16  A     Yes.

17  Q     Now, Mr. West, if you would turn over to Question 4 on

18  Page 2 of Exhibit 4?

19  A     Yes.

20  Q     There's the listing of the original *Morrison versus*

21  *Amway* lawsuit before Judge Harmon; is that correct?

22  A     Yes.

23  Q     It's Case Number 98-0352?

24  A     Yes.

25  Q     All right.  Now, Mr. West, do you know by the style

1  number or do you otherwise know that this original lawsuit

2  was filed in 1998?

3  A    Yes.

4  Q    And have you considered that fact in deciding whether

5  or not to go forward with the proposed settlement?

6  A    Yes.

7  Q    Now, Mr. West, when you found out about this claim, did

8  you do an investigation?

9  A    Yes.

10 Q    Did you review documents?

11 A    Yes.

12 Q    Did you contact the State Court Counsel?

13 A    Yes.

14 Q    Did you have conversations and meetings with them?

15 A    Yes.

16 Q    Did you review deposition transcripts?

17 A    Yes.

18 Q    Did you look at everything that anyone would give you

19 regarding the claim?

20 A    Yes.

21 Q    Now, you actually made the decision to hire the

22 existing State Court Counsel to pursue the claims, correct?

23 A    Yes.

24 Q    And what was the nature of the engagement that you

25 reached with State Court Counsel?

1    A    Contingency Agreement.

2    Q    All right.  And as we stand here today, what do you

3    believe the applicable contingent fee percentage is?

4    A    40 percent plus expenses.

5    Q    All right.  And have you had concerns about what the

6    expenses would be?

7    A    Yes.

8    Q    Have you attempted to limit the estate's liability

9    regarding expenses?

10   A    Yes.

11   Q    Have you talked to Mr. Akers about his willingness to

12   enter into a cap regarding the expenses?

13   A    Yes.

14   Q    And have you reached an agreement?

15   A    Yes.

16   Q    What's that agreement?

17   A    50 percent fee and expense.

18   Q    So the total fees and expenses in the case will not

19   exceed 50 percent of the recovery?

20   A    Correct.

21   Q    You are not agreeing to 50 percent, correct?  You're

22   just agreeing that there is a cap of 50 percent?

23   A    Correct.

24   Q    All right.  So anybody who wants to contest Phillips

25   and Akers fees, if they have standing to do it, they can do

1   it.  You're not making any agreements.  You're just saying

2   it can never be more 50 percent, correct?

3   A    Correct.  It would have subject to court -- anything

4   like that would have to be subject to court approval.

5   Q    Right.  Now, Mr. West, was reaching that agreement,

6   something that you considered in making your decision to go

7   forward with this agreement?

8   A    Yes.

9   Q    Now, Mr. West, I'd like for you to look at Exhibit 6.

10  This is a claims docket for the case, correct?

11  A    Yes.

12  Q    Have you gone back, and without getting into the merits

13  of each specific claim, have you attempted to determine the

14  gross amount of claims outstanding, net of the Amway claims

15  and net of any claims that have been withdrawn?

16  A    Yes.

17  Q    And, what's that number?

18  A    Approximately, I believe around $38,000.

19  Q    All right and under the Bankruptcy Code, those

20  claimants are entitled to interest?

21  A    Correct.

22  Q    And that interest is an ever-changing rate from 2005

23  forward?

24  A    Correct.

25  Q    Have you actually sat down and tried to calculate what

1  the accrued interest is?

2  A    I did a rough estimate.  I believe it to be about

3  $7,000.

4  Q    All right, so that's roughly $45,000 of unsecured

5  claims?

6  A    Correct.

7  Q    Is that a fair statement?

8  A    Correct.

9  Q    Now, if the settlement is approved, is it your belief

10 that the estate is going have to prepared and file a tax

11 return?

12 A    Yes.

13 Q    And have you attempted to estimate any tax liability in

14 the estate?

15 A    Yes.

16 Q    And, what do you think that the total preparation and

17 taxes due will be?  Just, your best estimate?

18 A    $12,500.

19 Q    Okay.  Now, Mr. West, have you attempted to ascertain

20 the amount of other administrative expenses that will have

21 to be paid?

22 A    Yes.

23 Q    All right.  Can you give us a range?  I understand that

24 you can't predict the future if there is an appeal or

25 something like that.  I understand you can't predict the

WILLIAM WEST -- DIRECT BY MR. JONES                    33

1   future, but what is your best estimate today of what the

2   other administrative expenses would be?

3   A     Approximately $75,000.

4   Q     Now, Mr. West, I tried to do rough math.  We add that

5   up, that's approximately $135,000, give or take?

6   A     Correct.

7   Q     And, what is the, what was the gross recovery under the

8   proposed settlement?

9   A     A little over $426,000.

10  Q     All right and if you assume that Mr. Akers' is capped

11  at 50 percent, --

12  A     Correct.

13  Q     -- that would leave roughly a little over 213 net to

14  the estate?

15  A     Correct.

16  Q     And if you assume that your close on your estimate,

17  then all claims would be paid in full, correct?

18  A     Correct.

19  Q     With interest, correct?

20  A     Correct.

21  Q     And there would actually be money going back to the

22  Debtor; is that correct?

23  A     Correct.

24  Q     All right.  Now, and Mr. West, did you consider the

25  potential for that result in making your decision as to

1  whether or not to go forward with the settlement?

2  A    Yes.

3  Q    Now, Mr. West, in preparing for the mediation in May,

4  did you solicit input from the Debtor regarding his thoughts

5  about the case?

6  A    Yes.

7  Q    All right.  Let's look at Trustee Exhibit 8.  This is

8  an email stream between you and Mr. Councill; is that

9  correct?

10 A    Correct.

11 Q    All right, let's go to page 2, since that will be the

12 earlier email.  This was on Wednesday, May 12, 6:17 p.m.,

13 correct?

14 A    Correct.

15 Q    This was your response to a letter or note from

16 Mr. Councill, correct?

17 A    Correct.

18 Q    And, I'll just read it, you'll follow along.  It says:

19      "Dear Mr. Councill, Thank you for your letter.  While

20      I've been briefed on the lawsuit related issues by

21      Brock Ackers, I welcome any input that you would like

22      to provide regarding the quantification of the damages

23      that have been incurred.  It would be really helpful if

24      you could send me a spreadsheet or memo outlining your

25      perceived damages.  Thank you, William G. West."

1              Correct?  Did I read that correctly?

2    A    Yes.

3    Q    All right.  And then if you turn to the first page, on

4    Saturday, May 15 you got a response from Mr. Councill,

5    correct?

6    A    Yes.

7    Q    All right.  And in it he attached a damage model from

8    the underlying case that was prepared by the Plaintiff's

9    expert which valued Mr. Councill's damages at $16,000,000

10   correct?

11   A    Yes.

12   Q    All right.  We'll talk about that in just a second.

13             I wanted to, if you'll go down to the bottom

14   of the email, Mr. Councill starts a paragraph read only:

15        "Bankruptcy has ruined my reputation as a business man

16        just word bankruptcy means failure.  My kids and wife

17        have and do see me as a failure.  I've had death

18        threats and recorded them.  I've been told before

19        arbitration by the Amway Attorney Pierce that if I did

20        not drop the case I would have to file bankruptcy and

21        that he would take everything I owned of which came

22        true."

23             Did I read that correctly?

24   A    Yes.

25   Q    Now, Mr. West, as you read this, I mean, did you

1   consider what Mr. Councill was telling you?

2   A     Yes.

3   Q     And, let's go on with paragraph 1, it says:

4         "Amway et al they kept $60K in money and bonuses and

5         they 1099 me for them as an offset on the $7 million."

6                   Did you consider that fact in making your

7   decision to accept the settlement?

8   A     Yes.

9   Q     Number 2 it says:

10        "Amway et al changed the rules after my bankruptcy to

11        say that if a distributor filed bankruptcy they would

12        take your Amway business.  This business up until the

13        day I filed, produced $2 to $3K per month and would

14        have continued for years and years, people like the

15        products.  This business was willable and transferable

16        when I joined."

17                  Did I read that correctly?

18  A     Yes.

19  Q     Did you consider that fact when you made the decision

20  to accept the settlement?

21  A     Yes.

22  Q     Number 3:

23        "The mental anguish that there were people so loyal to

24        these Amway kingpins that they would threaten me and my

25        family has been to say the least bothersome.  I've had

1        to look over my back for 14 years."

2                Did you consider that statement in making

3   your decision to accept the settlement?

4   A    Yes.

5   Q    Number 4:

6        "College for middle daughter had to stop in the second

7        year at A&M because working two jobs, I could not pay

8        for it.  No one would loan me money."

9                Did you consider that statement when making

10  the decision to accept the settlement?

11  A    Yes.

12  Q    But paragraphs 5, 6, and 7, did you read those and

13  consider those in earnest in making the decision to go

14  forward with the settlement?

15  A    Yes.

16  Q    So you didn't ignore Mr. Councill's feelings and

17  thoughts about what was going on?

18  A    I did not.

19  Q    Now, I want to talk a little bit about the expert

20  report that you got, and if you'd turn to page 3.  Actually

21  has the new page number 1 down at the bottom.  It is

22  entitled "Engagement Scope."  Do you see that?

23  A    Yes.

24  Q    All right.  And this is sort of the introduction of the

25  expert report prepared for the Plaintiff's by Mr. Lawrence;

WILLIAM WEST -- DIRECT BY MR. JONES                    38

1   is that correct?

2   A    Yes.

3   Q    And prior to getting this, have you seen this document?

4   A    Yes.

5   Q    All right.  And if you look at the last page, there's a

6   model doing a calculation of numbers, for lack of a better

7   term, correct?

8   A    Yes.

9   Q    All right.  Now, when you first saw this, did you

10  undertake an analysis of this report?

11  A    Yes.

12  Q    In fact, did you obtain the transcript of the

13  arbitration hearing where Mr. Lawrence testified?

14  A    Yes.

15  Q    And did you discuss how the testimony went with your

16  counsel?

17  A    Yes.

18  Q    And, again, I don't want to cast dispersions on anyone,

19  how would you categorize the testimony of Mr. Lawrence and

20  the validity of his report?

21  A    I found it somewhat hard to believe him.

22  Q    Did Mr. Lawrence in fact admit that the damage model

23  was based upon information that had no tie to reality?

24  A    Yes.

25            **MR. BECK:**  We'll object to that, Your Honor as

1  hearsay.  If he's got a copy of the transcript, we welcome

2  to introduce that or read from it.  But just to reproduce

3  his testimony here through second hand, we have hearsay

4  objection.

5          **MR. JONES:**  Happy to do that, Judge.

6          **THE COURT:**  I'll sustain the objection.

7        **(Pause)**

8          **MR. JONES:**  Judge, may I approach?  I only have

9  one copy of this.

10         **THE COURT:**  Why don't you put it on the screen and

11 that way Mr. Beck can see it at the same time.  It should be

12 up when you turn it on.

13 **BY MR. JONES:**

14 Q    All right, Mr. West, can you see that?

15         **MR. JONES:**  Judge, is there anyway to make it

16 clearer or better?

17         **THE COURT:**  Yeah you just need to learn to work

18 the technology.

19         **MR. JONES:**  That's fair enough.

20         **THE WITNESS:**  I see it.

21 **BY MR. JONES:**

22 Q    You can see that?

23 A    Yes.

24 Q    All right.  Now if you look down at the bottom, this is

25 testimony -- and you've reviewed this, correct, Mr. West?

1    A    Yes.

2    Q    And you've relied upon this transcript in making your

3    decision to go forward with the proposed settlement,

4    correct?

5    A    Yes.

6    Q    All right.  Now, read down to line 21, you just read

7    along with me:

8         "Q   Your model, which in the original one estimates

9         more than $117 million in total, it assumes that every

10        claimant will reach diamond qualification regardless of

11        their actual performance prior to 1997; is that

12        correct?

13        "A   Correct."

14             Did I read that correctly?

15   A    Yes.

16   Q    All right.  Going on to the next page,

17        "Q   Okay, for example you did not take into account

18        the actual profits or losses on their tax returns

19        during the relevant period of time, right?

20        "A   Correct."

21             Now, Mr. West, have you ever done economic

22   loss calculation of the CPA or as a Trustee?

23   A    Yes.

24   Q    Are actual profit and losses important to you in

25   determining what the amount of loss is?

WILLIAM WEST -- DIRECT BY MR. JONES                    41

1   A     Yes.

2   Q     Let's go a little further into the testimony.  Line 18:

3         "Q   Okay, but the problem with data that went into

4         your model is that you just took numbers from these

5         questionnaires and you didn't check them or compare

6         them with each other, right, to see if the were

7         plausible?

8         "A   That's correct."

9              Did I read that correctly?

10  A     Yes.

11  Q     Starting at Line 25:

12        "Q   You did not even attempt to connect the dots

13        between all these claimants on the front end of the

14        model and look if it would make sense with this whole

15        -- we have a group here.  They were all arraigned the

16        same way.  I mean, if it would make sense that if this

17        guy had 500 and this guy 800 and this guy had this, you

18        never did that, right?

19        "A    No.  That didn't happen."

20              Now, that was doing the math to see if the

21  down lines all matched up together, correct?

22  A     Yes.

23  Q     All right, going on in the testimony, on Line 11:

24        "Q   It went unchecked.  It went unchecked.  The number

25        came into your model unchecked; is that right?

1        "A   It, it the way you describe it, you know, you

2        could say that."

3                Did I read that correctly?

4   A    Yes.

5   Q    Going on:

6        "Q   You didn't consider the actual historical

7        performance at all, right?

8        "A   I had no records."

9                Line 16:

10       "Q   I guess the bottom line of at this point is just

11       that the data was unchecked right.  You didn't check

12       it.  You just put it in your model from the

13       questionnaire; is that right?  You didn't check it.

14       When I say unchecked, you didn't look at the actual

15       historical performance.  Instead, you let them take

16       whatever wild imagination they had that their business

17       would have been like if they said it was going to be

18       this, you took that information, you plugged it into

19       your model, right?  You plugged it into the model what

20       they felt number one, their number of down line

21       distributors would have been in 1997 and the year they

22       thought they would have gone diamond, right?  And that

23       was unchecked?

24       "A   That's basically correct."

25                A little further down:

1          "Q    In admission by the expert, this model was never

2       meant to be precise and it could not be precise."

3                  Again, Mr. West, did you rely on this

4   testimony in assessing the credibility of that damage

5   report, in deciding to go forward with the settlement?

6   A     Yes.

7   Q     "Q    Didn't analyze the information to see if it was

8       accurate, right?

9       "A    You mean the group?

10      "Q    Yes, sir.

11      "A    Information --

12      "Q    Any of the information to see if was accurate that

13      they gave you?

14      "A    That would be a fair statement."

15                  And at the end of the examination:

16      "Q    Virtually every one of the damage calculations

17      that you've made is wrong, yes?

18      "A    Mathematically, yes or classification-wise, yes."

19                  Now, Mr. West, did you consider the problems

20  with the expert's testimony and the damage model that

21  presented at arbitration, did you consider that in making

22  your decision whether or not to accept the proposed

23  settlement?

24  A     Yes.

25  Q     Now, Mr. West, you went to mediation, correct?

WILLIAM WEST -- DIRECT BY MR. JONES                          44

1   A    Correct.

2   Q    And toward the end of the mediation, you actually got

3   another communication from Mr. Councill; is that correct?

4   A    Yes.

5   Q    All right.  Let's turn to Trustee Exhibit 9.

6                Actually, before we do that, Mr. West, did

7   you ever attempt to do your own analysis of what the claims

8   were really worth?

9   A    Yes.

10  Q    All right.  Now, I think you previously testified you

11  had conversations with Mr. Akers, correct?

12  A    Yes.

13  Q    Did you also attempt to do your own -- sort of your own

14  analysis based upon the information that you had available

15  to you?

16  A    Yes.

17  Q    All right.  Let's turn to Trustee Exhibit 11.  And what

18  is this document?

19  A    A worksheet summary from information from tax returns

20  of the Debtor.

21  Q    Okay.  And was this information used during arbitration

22  and accepted by both Amway, by the Amway parties, as well as

23  the Plaintiff parties?

24  A    That's my understanding.

25  Q    Right.  And did you take this information --

WILLIAM WEST -- DIRECT BY MR. JONES                    45

1          **THE COURT:**  Excuse me, just, did you say it was

2    used at the mediation or that it was used at the

3    arbitration?

4          **THE WITNESS:**  Excuse me, the arbitration.

5          **MR. JONES:**  If I said mediation, then I was wrong,

6    it's the arbitration.

7          **THE COURT:**  No, you may have said arbitration, I

8    just thought mediation, I just wanted to be sure I heard it

9    right.  This was used at the arbitration?

10         **THE WITNESS:**  This was used, yes, sir.

11         **THE COURT:**  Okay.  Thank you.

12   **BY MR. JONES:**

13   Q    In fact, so that we're clear, Mr. West, did this come

14   out of Amway's expert's report?

15   A    Correct.

16   Q    All right.  And it wasn't challenged by the Plaintiff's

17   in terms of the content or the data, correct?

18   A    Correct.

19   Q    Now, Mr. West, did you look at those bottom line

20   numbers in terms of the net income in an effort to value the

21   claims?

22   A    Yes.

23   Q    And did you consider this information in reaching your

24   decision to go forward with the settlement?

25   A    Yes.

1    Q    Now, you didn't have actual copies of tax returns from

2    1990 to 2001, did you?

3    A    No.

4    Q    You did have some of them, correct?

5    A    Yes.

6    Q    And did you verify the information for the ones that

7    you had?

8    A    Yes.

9    Q    Now, Mr. West, let's go back to Exhibit 9.

10   A    All right.

11   Q    This is an email from Mr. Councill?

12   A    Yes.

13   Q    To you toward the conclusion of the mediation, correct?

14   A    Yes.

15   Q    All right.  And in fact you just read the first line,

16   if you'd along with me it says:

17        "All, please note that I object to agreeing to any

18        offers from the Defendants in the *Morrison v. Amway, et*

19        *al* case from my bankruptcy estate for the following

20        reasons."

21                    And then it lists some reasons, correct?

22   A    Yes.

23   Q    All right I want to go through some of those.  All

24   right.  The first reason that Mr. Councill gives, it says:

25        "It is not clear to me who is representing our interest

1        (as Debtors) in this matter.  I understand their

2        original attorney was also hired by the Trustees.

3        Don't know how Brock Akers/Craig Cowgill can represent

4        us and the Trustees especially since we have different

5        goals in this mediation.  I have not been thoroughly

6        advised on what fiduciary responsibility, if any, the

7        Trustees owe the Debtors.  It would seem to me to be a

8        conflict of interest for anyone to represent the

9        Trustees, as well as the Debtors in this matter."

10                Did I read that correctly?

11  A    Yes.

12  Q    And did you consider this objection that Mr. Councill

13  had to the process?

14  A    Yes.

15  Q    Did it in any way effect your decision regarding the

16  viability of the proposal?

17  A    No.

18  Q    Let's go to number two:

19        "As I have continually asked my counsel (including

20        written request) for a proper and professional damage

21        assessment be conducted for losses in the underlying

22        case as well as the damages caused by the bankruptcy.

23        David Roberts and I went as far as researching and

24        meeting with a viable candidate firm to conduct this

25        damage assessment and develop a model for all

1          Plaintiffs that can be used for the Plaintiffs' cases.

2          At Brock's request, we even provided their contact

3          information.  Brock never contacted them.  We even went

4          as far as offering to pay for this expense ourselves.

5          I was informed by Brock that he overlooked the deadline

6          to designate such an expert."

7                    Did I read that correctly?

8    A    Yes.

9    Q    And did you consider this statement in making your

10   decision to go forward?

11   A    Yes.

12   Q    Number 3:

13          "The failure of the Trustees and their counsel to have

14          an arguable, professional and competent damage model

15          that can be defended has seriously crippled us and any

16          effort to mediate these cases."

17                    Did I read that correctly?

18   A    Yes.

19   Q    Now, the only damage model that you see is the one

20   that, other than the one you did yourself, is the one that

21   Mr. Councill sent you, correct?

22   A    Yes.

23   Q    Number 4:

24          "A damage model was provided to my Trustees and

25          Trustees' counsel without my input advice for approval.

WILLIAM WEST -- DIRECT BY MR. JONES                    49

1      I am not agreeing with the damage model provided as it

2      only relay's on tax returns and has zero provision for

3      damages as a result of the bankruptcy.  Any competent

4      damage expert will attest that tax returns are only

5      part of the equation in determining damages.  There has

6      not been a damages expert conduct any model or

7      estimates since our bankruptcy filing.  That alone

8      should send up all kinds of warning signs."

9              Did I read that correctly?

10 A     Yes.

11 Q     Now, and Mr. West, did you consider that fact?

12 A     Yes.

13 Q     Now, in fact, did you investigate what damages could

14 exist from a party voluntarily filing bankruptcy?

15 A     Yes.

16 Q     Now, did you look to see if there'd been any collection

17 activity against any of the Debtors?

18 A     Yes.

19 Q     And with respect to Mr. Councill other than abstracting

20 the judgment, was there any collection activity at all?

21 A     I don't know of any.

22 Q     Never saw any writs of execution?

23 A     No.

24 Q     Never saw any request for receiver?

25 A     No.

1  Q    Never saw any writs of garnishment?

2  A    No.

3  Q    Nothing?

4  A    No.

5  Q    So, Mr. Councill made the decision, filed bankruptcy on

6  the Friday before the law changed in Order to take advantage

7  of the existing law, fair statement?

8  A    Yes.

9  Q    All right.  Now, Number 5:

10      "The mediator and Trustee's counsel have made offers to

11      various Defendant's groups without my approval or

12      input."

13              That's a true statement, correct?

14 A    Yes.

15 Q    Okay.

16      "All though I am not clear if the Trustee's need of our

17      approval, the latest round of offers, would not be

18      offers I would approve especially since no plan has

19      been indicated how such a settlement would be divided."

20              Did I read that correctly?

21 A    Yes.

22 Q    Now, in fact, Mr. West, there already been discussions

23 amongst the Trustee with a relative weighting obtained from

24 Mr. Akers, correct?

25 A    Yes.

1   Q     And you are using that weighting as every offer came in

2   to evaluate the claim on behalf of your estate; is that

3   correct?

4   A     Yes.

5   Q     All right.  Now, I want to turn over to the second

6   page.  And the paragraph that begins "That being said," I

7   want you to read along with me.  It says:

8         "That being said, if a settlement is reached wherein

9         George and Janet's bankruptcy estate is settled, all

10        parties agree to petition the court to reverse the

11        bankruptcy filing by court Order (correct credit bureau

12        files and whatever is necessary) and we are able to net

13        at least $200,000 after all court expenses, mediation

14        costs and attorney's fees, we will agree to forego what

15        will surely be a lengthy, but necessary process for us

16        to be justly compensated, the actual damages my family

17        has suffered due to the Defendant's actions."

18                    Did I read that correctly?

19  A     Yes.

20  Q     Mr. West, regardless of whether this is right or not,

21  did you consider Mr. Councill's strong feelings in deciding

22  whether or not to proceed with the settlement?

23  A     Yes.

24  Q     All right.  Now, Mr. West, after, after the Settlement

25  Agreement that was entered into amongst the parties, did

1   Mr. Councill hired a lawyer to file an objection; is that

2   correct?

3   A    Correct.

4   Q    And did you read that objection.

5   A    Yes.

6   Q    And did you have the opportunity to discuss the nature

7   of those objections with counsel?

8   A    Yes.

9   Q    Was there anything in those objections that caused you

10  to take pause and say "Maybe I didn't think about

11  something?"

12  A    No.

13  Q    But you considered what he had to say in terms of

14  objecting to the proposal?

15  A    Yes.

16  Q    Now, Mr. West, did you also receive a letter, dated

17  September 14, 2010 to Brock Akers from Mr. Roberts and

18  Mr. Councill?

19  A    Yes.

20  Q    Now let's turn to Exhibit 10.  And this is a letter,

21  please read along with me, first paragraph, it says:

22       "As you are probably already aware an objection to this

23       motion of compromise was filed with Judge Isgur and

24       Judge Clark late Monday, 9/13/2010, for both David

25       Roberts and Randy Councill in regard to our respective

1      bankruptcy cases."

2              Reading on:

3      "While it is appreciated that Phillips and Akers has

4      told with the underlying case for nearly 13 years, many

5      of the delays were in fact caused by the actions or

6      non-actions of your firm.  Phillips and Akers has some

7      serious issues regarding how this underlying case was

8      handled in the early stages, which are not limited to

9      the following examples.  Number one, your firm was

10     aware that Amway was going to launch an arbitration

11     scheme on January 1, 1998 and despite our repeated

12     pleadings to firm to file suit before the arbitration

13     took effect, didn't file the suit until January 8, 1998

14     thus loosing the advantage of having our dispute

15     recorded before the Defendant's scheme took effect.

16         "Number two: It has been, it is very arguable that

17     had the suit been filed timely, as requested, the

18     Plaintiff's would have not been forced into an

19     unfavorable arbitration scheme which ultimately

20     resulted in personal bankruptcy which cannot be

21     reversed or remedied and have become permanent parts of

22     our personal credit histories.

23         "Number three.  Phillips and Akers represented to

24     the Plaintiffs in no uncertain terms that the firm had

25     the financial resources to pursue a suit of this

1        magnitude, including covering the expense of giant

2        discovery load, when in fact, in most scenarios, the

3        firm used an intern or a junior attorney right out of

4        law school as the primary resources devoted to the case

5        through out the nearly 13-year history."

6            **MR. BECK:**  Your Honor, at this point, I'd just

7    like to object to the fact that, this document is already in

8    the record.  If we are just going to sit here and read the

9    document without asking a question, he can sit, we can

10   pause, he can read the document himself.  Let's get back to

11   a question.

12           **THE COURT:**  What's the point of the letter,

13   Mr. Jones?  It's admitted, I agree, but what are you trying,

14   what's your point?

15           **MR. JONES:**  Judge, the point of the letter is

16   two-fold.  Number one, we're going to get to the fact that

17   in fact you see, number one these claims would be estate

18   property.  Number two, there is then on page two, an attempt

19   to get Mr. Akers to extort him, as part of his fee, in order

20   to withdraw their objections to the compromise.  That is

21   clearly relevant to the Trustee's decision in evaluating the

22   credibility of the Witnesses and what to do, because he

23   didn't stop his decision process when the motion got filed.

24   He's continued to look at objections filed by the parties,

25   as well as this letter complaining about all the things that

1   were mishandled in the case by Phillips and Akers.

2           **THE COURT:**  I read the letter before I came out.

3   So why don't you ask him the question that you want to ask

4   him which is I think your only question him, which I think

5   Mr. Beck's point is, did you consider the letter, right?  Do

6   you have some other question?

7           **MR. JONES:**  I do have a couple of other questions

8   if I am permitted to ask them.

9           **THE COURT:**  Go ahead.  But I do think it is a

10  waste of everybody's time just to read it, so.

11          **MR. JONES:**  Well, I wanted it to be clear, Judge

12  and I'll make the announcement on the record:  A letter was

13  sent to Mr. Roberts and Mr. Councill saying you don't own

14  these claims and you ought to talk to a lawyer because we

15  think Title 18 is implicated.  We forwarded the letter to

16  the U.S. Trustee and there's been discussion with the U.S.

17  Trustee as to the effect of this letter.  I simply wanted

18  all that on the record because I think it's part of the

19  decision process in deciding what to do with these claims.

20          **THE COURT:**  That's fine.  I don't think we need to

21  go read the letter out loud so.

22  **BY MR. JONES:**

23  Q    Mr. West, you've read Trustee's Exhibit 10, correct?

24  A    Yes.

25  Q    And each and every one of the points that were raised

1   by Mr. Councill and Mr. Roberts you considered, did you not?

2   A    Yes.

3   Q    And in fact, is it your opinion that if, in fact, these

4   were true, that it actually supports your decision to go

5   forward with the settlement?

6   A    Yes.

7   Q    Now, Mr. West, after looking at all of the documents

8   available in the case, looking at all the testimony that

9   you've been provided, do you think that you have considered

10  all of the relevant information necessary to make an

11  informed decision?

12  A    Yes.

13  Q    All right.  Now Mr. West, one of the complaints raised

14  by Mr. Councill is that with respect to the adversary from

15  Judge Isgur 08-3260, that you did nothing to value the

16  claims.  Do you recall that objection?

17  A    Yes.

18  Q    Is that a true statement?

19  A    No.

20  Q    Please tell us what you did in Order to understand what

21  that lawsuit was about.

22  A    It had to do with fraud in the arbitration and the

23  damages related to that.

24  Q    Did you have multiple meetings with Mr. Akers regarding

25  his damage theory?

1    A     Yes.

2    Q     All right.  Did you have multiple conversations with me

3    about my concern about the damage model?

4    A     Yes.

5    Q     All right.  What was Mr. Akers damage model for that

6    lawsuit?

7    A     Attorney's fees.

8    Q     And on what did he base the attorney's fees?

9    A     Well, he was engaged on a contingency.

10   Q     What about of attorney's fees had been incurred either

11   by the Debtors or by the estate up to that point?

12   A     On that adversary?

13   Q     Yes, for the arbitration?

14   A     None to my knowledge.

15   Q     All right.  And, in fact, has there ever been a proof

16   of claim filed in the case by anyone asserting an attorney's

17   fee claim?

18   A     No.

19   Q     Did that cause you concern?

20   A     Yes.

21   Q     All right.  And I think you previously testified you

22   also attempted to understand if there was a viable damage

23   theory for someone filing bankruptcy when no one was

24   attempting to take their property, correct?

25   A     Yes.

WILLIAM WEST -- DIRECT BY MR. JONES                    58

1  Q     And based upon that, did you have serious concerns

2  about whether or not that was a viable lawsuit?

3  A     Yes.

4  Q     Did you consider all of that in making your decision to

5  accept $426,000 and change in Order to resolve the estates

6  claims against the Amway parties?

7  A     Yes.

8  Q     And Mr. West, how long have you been a Trustee?

9  A     Nineteen years.

10 Q     All right.  And in that time, do you think you've

11 presided over 10,000 or more cases?

12 A     Yes.

13 Q     And you've done lots of motions to compromise under

14 rule 9019?

15 A     Yes.

16 Q     All right.  Mr. West, do you believe that the proposed

17 settlement is in the best interest of the estate?

18 A     Yes.

19 Q     And given all that you've heard, all that you've read,

20 including the objections by the Debtor, are you still asking

21 the court to approve the settlement as filed?

22 A     Yes.

23        **MR. JONES:**  Judge, I don't have anything further.

24        **THE COURT:**  Thank you.

25            Mr. Sparacino, since you're aligned with

Mr. Jones, I want to get your questions out of the way so that Mr. Beck is only dealing with a single line of attack. I don't know if you have anything, but if you do, go ahead.

**MR. SPARACINO:** I was willing to let Mr. Beck go first, but --

**THE COURT:** Well, I'd rather, I think he'd probably prefer to know what the whole case is going to be before he goes.

**CROSS-EXAMINATION OF WILLIAM WEST**

**BY MR. SPARACINO:**

Q Good afternoon, Mr. West. I'd like you to turn back to the Trustees Exhibit Number 1 - excuse me, Exhibit 3.

A Yes.

Q Correction again, Exhibit 4, the SOFAs, the Statement of Financial Affairs.

A Yes.

Q And specifically again focus on question number one.

A Yes.

Q In which the Debtor is suppose to identify income from employment or operation of business for the proceeding two years -- for the current year and the proceeding two years, correct?

A Yes.

Q And you see the amounts that are identified, correct?

A Yes.

1  Q    Amounts, sources are identified as water works, utility

2  and Telegistics for 2003; is that correct?

3  A    Yes.

4  Q    Another source for 2004 is water works, utility and

5  Telegistics, Inc.; is that correct?

6  A    Yes.

7  Q    And for year to date 2005, the source is Telegistics,

8  correct?

9  A    Yes.

10  Q    Do you see anywhere in there a disclosure of any income

11  earned from an Amway business?

12  A    No.

13  Q    Would that, what factor into your assessment as to the

14  credibility of this Debtor?

15  A    Yes.

16  Q    Do you recall earlier in this bankruptcy case, there

17  was an adversary proceeding commenced by the Debtors,

18  Mr. and Mrs. Councill, against Amway?

19  A    Yes.

20  Q    And do you generally recall that that adversary

21  proceeding the complaint asserted or sought recovery of

22  post-petition Amway business bonus dollars that were

23  allegedly due and owing them, according the Debtors?

24  A    Yes.

25  Q    Do you recall that you, as Trustee, took a position

1   regarding who owned those claims?

2   A    Yes.

3   Q    And do you recall that your position was that the

4   Trustee, the estate owned those claims?

5   A    Yes.

6   Q    Do you continue today to believe that the Trustee of

7   the estate owns and controls the claims for post-petition

8   Bonuses generated by the business?

9   A    Yes.

10           **MR. SPARACINO:**  I have no further questions,

11  Judge.

12           **THE COURT:**  Thank you.  All right, Mr. Beck.

13           **MR. BECK:**  Thank you, Your Honor.

14              **CROSS-EXAMINATION OF WILLIAM WEST**

15  **BY MR. BECK:**

16  Q    All right, Mr. West, you have testified of many things

17  that you did look at in doing a damage evaluation for

18  accepting this compromised and Settlement Agreement; is that

19  right?

20  A    Yes.

21  Q    And you understand from our objection, it's really at

22  this point I think we've dealt with one issue, but it is

23  two-fold that there was no separate evaluation of the '08

24  adversary proceeding based on the claim of fraud for the

25  arbitration shenanigans, we'll call them, that went on with

1   regard the underlying suit, do you understand that to be one

2   of our positions?

3        **MR. JONES:**  Judge, just for the record, the

4   statement was the '08 adversary.  We ought to have a number,

5   because I actually think there was more than one piece of

6   litigation filed in '08.  If we just get the full adversary

7   number for the record.

8        **THE COURT:**  08-3260.

9   **BY MR. BECK:**

10  Q    Do you understand that that was based --

11  A    Yes.

12  Q    That wasn't based on the initial Amway business or

13  anything like that was it?

14  A    Correct.

15  Q    That was based simply on what happened with regard to

16  the arbitration agreement and the underlying arbitration.

17  A    Correct.

18  Q    And, what did you do or look at to put any type of

19  value on that particular portion of what was being settled

20  in the mediation?

21  A    None.

22  Q    Okay, and so as far as that portion of the claim as

23  being settled, you didn't put any value to it at all?

24  A    No.

25  Q    Why not?

1   A    It was basically based on attorneys' fees that weren't

2   paid.

3   Q    Did you consider the time and effort put in by the

4   Plaintiffs, and in this case particularly Mr. Councill and

5   his family with having to be involved in that arbitration

6   proceeding?

7   A    Yes.

8   Q    And what value did you put on that?

9   A    None.

10  Q    How much time did you consider how much time did you

11  estimate Mr. Councill and his family had to put in with

12  regard to participating in that procedure that we all know

13  was a basis for reversal of the judgment?

14  A    I do not know.

15  Q    Did you ever address that with Mr. Councill or ask

16  Mr. Councill what amount of time that he spent on that?

17  A    No.

18  Q    Did you ever talk to him about any sleepless nights,

19  any burning the midnight oil preparing for that kind of

20  thing?

21  A    No.

22  Q    Did you ever discuss with his wife any feelings she may

23  have had with regard to what was going on with that

24  arbitration?

25  A    No.

1  Q     Did you read the opinion of the Court of Appeals that

2  reversed that arbitration award that was made by Judge

3  Hammond?

4  A     I remember reviewing it at one time, but I can say

5  specifically when.

6  Q     Okay.  Did you review it at any point when you were

7  coming to a conclusion as whether or not this was a fair and

8  adequate value for settlement of the estates interest in

9  this case?

10  A     I don't recall.

11  Q     In valuing the settlement for the adversary proceeding,

12  I believe you said you talked to Mr. Akers about what his

13  damage model was, did you do any other, you didn't talk with

14  Mr. Councill, did you do anything else do an independent

15  valuation of what that was worth?  Anything else but to talk

16  to the lawyer who was filing the suit?

17  A     I don't recall.

18  Q     So if there was anything you did, you certainly didn't

19  consider it as far as trying to say whether or not we had a

20  fair value on the settlement; is that right?

21  A     I reviewed the information that was available to me.

22  Q     Okay, Mr. Councill, through letters, made himself

23  available, didn't he?

24  A     I think the letters I got from him were the day before

25  the mediation or so.

1  Q    But you had been his Trustee for about five years?

2  A    Correct.

3  Q    And the case had been on-going since 2008?

4  A    Correct.

5  Q    As far as just the fraud case?

6  A    Correct.

7  Q    But you made no other effort to contact him and see

8  what his feelings were or, let me understand, you've read

9  the amended complaint in that case; is that right?

10 A    I'm sure I did.

11 Q    And you understand that the damages set forth that were

12 being claimed in there had to do a lot more than just

13 attorney fees didn't they?

14 A    I don't recall.

15 Q    I don't think you have it front of you now.

16      **MR. BECK:**  May I approach the witness, Your Honor?

17      **THE COURT:**  Yes, sir.

18 **BY MR. BECK**

19 Q    I am going to hand you what's been marked as Exhibit 4

20 by the Debtor's.

21      **MR. SPARACINO:**  Mr. Beck, do you have --

22 **BY MR. BECK:**

23 Q    And if you would, please turn to page 29 of that

24 document.

25 A    All right.

1  Q     With the heading "Damages" in the middle of the page,

2  paragraph 29 states:

3       "Each of the Plaintiffs has suffered extreme damages as

4       a result of the scheme to force Plaintiffs into an

5       arbitration system that only Defendants knew was

6       essentially fixed from the start and the subsequent

7       efforts of Defendants to collect the arbitration award.

8       This lawsuit, which reflected a culmination of life

9       work of many of these Plaintiffs was delayed by a

10      decade as a result of the farce of an arbitration

11      hearing before the arbitrator who was corrupt pursuant

12      to the arbitration scheme which was unenforceable.

13       "The delay and the cost of the arbitration itself,

14      which was absorbent to the extreme, was the direct and

15      approximate result of Defendant's conduct.  The

16      arbitration resulted in a risk of absolute and complete

17      financial ruin, just as the defense had predicted

18      rather than simply running the risk of losing their

19      lawsuit, the arbitration scheme (which they claimed was

20      developed for the benefit of the individual Plaintiffs)

21      had a loser payout provision.

22       "The result was an arbitrational award $6 million

23      against the Plaintiffs.  Defendant took steps to

24      collect this award and further ruined the credit

25      worthiness of the Plaintiffs.  Many of the individuals

1         affected by this award actually paid money to the

2         Defendant to erase their liability."

3                 Again, did you do anything to investigate as

4    far as Mr. Councill is concerned what toll this arbitration

5    award had on him and his family?  What financial toll it had

6    on them?  What physical toll?  What mental toll?  Did you

7    consult any physicians?  Did you talk to anybody?

8    A     No.

9    Q     Did you consider if these provisions and the suit

10   represented by Exhibit 4 was tried, is it your position that

11   any punitive damages would be likely?

12   A     I couldn't say.

13   Q     Before today, when's the last time you saw this

14   document?

15   A     I don't recall.

16   Q     Do you recall if you reviewed it at any time during the

17   mediation?

18   A     I don't believe so.

19   Q     So as far as the damages that were sought in this

20   complaint, you don't recall having reviewed those at the

21   time you made the decision to accept this?

22   A     I recall the attorney's damages cause that had been

23   discussed.

24   Q     But you didn't do an independent evaluation on your

25   own?

1   A    Other than, other than, no, other than discussing the

2   attorney's fees.

3   Q    By way of hypothetical, if a Debtor had a non-exempt

4   piece of real estate that you needed to sell in Order to

5   maximize the benefit to the creditors and the bankruptcy,

6   wouldn't you get an appraisal?  Would you make some sort of

7   effort to value that property before you took a bid on it or

8   even started the process of putting it on the market?

9   A    It depends if it was readily ascertainable or not and

10  the sources of the estate, the Chapter 7 Estate, to be able

11  to take on that expense.

12  Q    So there's a lot of things you need to consider, but

13  generally speaking, isn't it the duty of the Trustee to look

14  at those things?

15  A    To look, yes.

16  Q    As we discussed in this case, at least with regard to

17  the claim represented by Exhibit 4, there wasn't much that

18  we looked at aside from what maybe Brock Akers thought he'd

19  get in attorney fees?

20  A    Correct.

21  Q    I'd like to draw your attention back to, I think we've

22  looked at of the exhibits your counsel put forward,

23  Exhibit 11.

24  A    Yes.

25  Q    Counsel asked you at one point if you had done, and I'm

1  backing up now to the original lawsuit that was filed in '05

2  that spurred on the arbitration award, counsel asked if you

3  had done your own independent investigation on the damages

4  set forth in that case, and I think you answered yes.  But

5  this is not what you did; is that right, Exhibit 11, you did

6  not create this document?

7  A    No.

8  Q    This document was actually created by one of the Amway

9  Entities involved in that arbitration?

10 A    As I had said earlier.

11 Q    And that goes with page 1 and 2, Exhibit 11; is that

12 right?

13 A    Yes.

14 Q    It is fair to say that these documents were produced in

15 anticipation or participation in litigation?

16 A    Arbitration.

17 Q    Arbitration, sure.  And they were, I mean if you are

18 going to produce a document to support your own position,

19 you're going to skew it to your own side, aren't you?

20 A    Yes, but it is my understanding these were not objected

21 to.

22 Q    And how did you come by that understanding?

23 A    By my counsel.

24 Q    But were you at the arbitration?

25 A    No.

1  Q    So you know for sure whether or not there was any type

2  of objection raised by Mr. Akers or anybody on the

3  Plaintiff's side on that matter?

4  A    No.

5  Q    And with regard to the transcript that we went over

6  looking at Mr. Lawrence's damage model, who was asking the

7  questions in that transcript?  Do you know which attorney?

8  A    I don't recall.

9  Q    Do you have -- well, let me ask you this:  It's fair to

10 say that if it was one the Amway's parties attorneys, it was

11 their job to discredit that report, isn't that true?

12 A    Yes.

13 Q    And whether the report was creditable or not, the

14 attorneys job that day in that arbitration was to do

15 anything he could to discredit it, isn't that right?

16 A    Within reason.

17 Q    I think that you've testified that you've done the same

18 kind of damage model and I think you have it there, we'll

19 just use the one which you've already got in front of you.

20 It's attached to Exhibit 8.  When you have it in front of

21 you, I'm going to refer to it.  And this is the one that was

22 prepared just for Mr. Councill; is that correct?

23 A    Yes.

24 Q    And on page two, it says:

25       "Based on the calculation, the net present value of

WILLIAM WEST -- CROSS BY MR. BECK                71

1        damages is $16,638,943."

2                  And that's what it says on page two; is that

3  right?

4  A    Yes.

5  Q    Did you ever talk to Mr. Lawrence about that number?

6  A    No.

7  Q    Why not?

8  A    I reviewed that report.

9  Q    Is there anything in this report, in and of itself,

10  that would make you doubt that number?  Just as it sits

11  there not going into the transcript, not going into what

12  your counsel told you, just looking at that number?

13  A    From his responses, I questioned these numbers.

14  Q    And that's his response to questioning at the

15  arbitration hearing; is that right?

16  A    Correct.

17  Q    But you didn't take the opportunity at that point to

18  contact Mr. Lawrence and ask him what his situation was with

19  regard to that?

20  A    No.

21  Q    And I believe you've testified that you've done these

22  types of damage models in the past yourself; is that right?

23  A    No, I reviewed.

24  Q    Reviewed?  Okay.  And then I ask again then on the face

25  of this without regard to the questions asked in

1  arbitration, where do you see the flaw in this damage model?

2  A    The flaw is in the description in the questioning of

3  Mr. Lawrence of how he got these numbers.

4  Q    Okay, so again but you never talked to Mr. Lawrence

5  about where he got them, did you?  Or talk to him about his

6  testimony in the arbitration?

7  A    No.  I also compared it to the Exhibit 11 from the

8  Debtor that was pulled from the Debtors tax returns.

9  Q    Did you review those tax returns to see if all those

10  numbers were accurate on Exhibit 11?

11  A    2000 and 2001.

12  Q    We have established now that this Exhibit 11 that was

13  produced by Amway; is that right?

14  A    Correct.

15  Q    And of course their trying to low-ball because that's

16  what they do for their clients; is that right?

17  A    I don't believe so.

18  Q    Let me ask it to you this way, in accepting or deciding

19  this was a fair and adequate settlement, did you rely more

20  on Exhibit 11 than anything else?

21  A    No.

22  Q    How much weight do you think you put on that exhibit,

23  the damage model produced by Amway, in accepting their offer

24  to settle?

25  A    I can't quantify that.  I considered numerous issues in

WILLIAM WEST -- CROSS BY MR. BECK                    73

1   this case.  I think Mr. Jones probably asked me a couple

2   hundred questions did I consider this and I answered I think

3   most of them, "yes."

4   Q    Right.  And what I'm trying to come up with though, is

5   with regard to the actual damage number itself, what did you

6   look at, what did you feel going into that settlement,

7   Mr. Councill's actual damage number was?

8   A    I didn't have a specific opinion.

9   Q    Then how is it that you formulated that a fair and

10  adequate settlement was $426,000 and some change?

11  A    I considered a number of factors.  I considered this

12  Exhibit 8 and this Exhibit 11.  I considered what the Debtor

13  had filed on his Schedules and Statement of Financial

14  Affairs and the tax returns that had been turned over to me.

15  Q    At the time that the Schedules, Statement of Financial

16  Affairs were filed, there was already a judgment in place,

17  was there not?

18  A    I believe so.

19  Q    And so, and the Debtor did disclose the fact that the

20  court case was still pending and it was in appeal and put a

21  value on it at that point?

22  A    Yes.

23  Q    And the value on that was about, I believe it was

24  $6.7 million, does that sound about correct?

25  A    Yes.

WILLIAM WEST -- CROSS BY MR. BECK                74

1  Q    I think we have it if you need to refer to it.

2           Did you consider that number?

3  A    I considered -- yes, I considered the number.

4  Q    Okay.  Did you do any independent investigation as to

5  whether that number, where that number came from what the

6  value was?

7  A    No.  I did compare it to this again to Exhibits 8 and

8  11 and --

9  Q    What specifically on Exhibit 8 are you pulling from on

10 there?

11 A    Well, if you look at these totals, discounted totals

12 and the totals in this right-hand column, I'm not quit sure

13 where isn't that number on the schedules came from.

14 Q    Just so the Court and the record is clear, on Exhibit 8

15 you are looking at the spreadsheet on the last page?

16 A    Correct.

17 Q    And that spreadsheet shows and I'll just start with

18 2006 through the end of the line there between 2006 and

19 2054, approximately $811,835 in product income?

20 A    Yes.

21 Q    Another $1.3 million and some change in tool income?

22 A    Right.

23 Q    For a total income of $2.1 million over a 48-year

24 period?

25 A    Can you just repeat that?

1  Q    It is a total income of $2.1 million per year over a

2  approximately a 48-year period?

3  A    Correct.

4  Q    And your saying that's one of the numbers you

5  considered?

6  A    No, that number all the way over to the right.

7  Q    The discounted totals, is that where you're looking?

8  A    Yes.

9  Q    And if you add that column, the discounted total

10 column, up that's where they came up with the present day

11 value of the $16 million, isn't that right?

12 A    Through, yeah into 2006.

13 Q    Yes.  And I guess again I'm asking, your coming back

14 with the fact that you considered that number, what did you

15 find, how did you view that number?  Did you give it credit?

16 A    No.

17 Q    What do you find with regard to that number that is not

18 credible?

19 A    The testimony of Mr. Lawrence.

20 Q    And again that was the testimony in response to the

21 Amway attorney's questions; is that right?

22 A    Correct.  I would assume arbitration person -- someone

23 conducting the arbitration.

24 Q    With regards to the damages from the underlying suit,

25 did you do any other independent investigation in a

1  spreadsheet of your own to try to quantify what the Debtor's

2  damages were actually?

3  A    No.  I would -- let me say one thing.  It's

4  particularly the tax returns, I've been a CPA for 30 years,

5  I have a lot of experience with small businesses and I have

6  my, I say, my own opinion when I see cash flows from a

7  business of this nature what the value would be.

8  Q    Did you take any effort to put that into a numerical

9  value before you walked into the mediation?

10 A    Yes.

11 Q    What value did you give it?

12 A    Not a great deal.

13 Q    And why not?

14       **MR. JONES:**  Judge, I think when we get into

15 analysis that goes directly to conversations that he had

16 with his attorney, I'm going to assert attorney/client

17 privilege, and ask him what did you, what was the number but

18 how you got there, if the methodology came in meeting with

19 his counsel, then I don't think that's a proper subject of

20 inquiry.

21       **THE COURT:**  Overruled.

22 **BY** MR. BECK:

23 A    Repeat the question.

24 Q    My question is distinctly is with in looking at those

25 numbers, what value would you put on the business?

1  A    I can't give you an exact number.  But looking at the

2  business with this type of cash flow even projecting it out

3  ten years, taking a present value of it, it's not a large

4  number.  I believe it's, it would, you know, quite a bit

5  less than the settlement amount.

6  Q    And that would be an evaluation you would do if you

7  were going to sell the business, isn't that right?  You're

8  trying to get a fair value for the sell of the business?

9  A    Well you would -- I would assume you'd use it for that

10 purpose.

11 Q    Okay.  But in this case, we're not actually selling the

12 business, you're trying to settle a lawsuit because these

13 Plaintiff's claim that the -- what the Defendants were doing

14 to them caused them to have such a low cash flow or low

15 profitability, when they expected to have more, isn't that

16 right?

17 A    Well, I really don't have personal knowledge of that,

18 but even if you look at the numbers before, if you use the

19 numbers before 1997, you still don't come up with a very big

20 number.

21 Q    Let me ask you this, then, what is your understanding

22 as to what is being settled in the '05 lawsuit?

23 A    The settlement, that was basically a breach of contract

24 lawsuit.

25 Q    And, I guess what I'm asking you as someone who is

1  going to accept this as an adequate settlement for that

2  breach of contract, what were they claiming was the breach?

3  A    That the Defendant was changing the deal.

4  Q    And that effected them how, in a monetary way, in a

5  status way, I just want to know that your understanding is

6  trying to settle this claim as to what were you looking at?

7  A    That they were, this was settling the lawsuit, but I

8  think we're talking about the '98 lawsuit?

9  Q    Yes.

10 A    Okay.  I think we said '05, but I think we met '98?

11 Q    Yes, correct, thank you.

12 A    That was a breach of contract and it was the Defendants

13 had changed, they were changing the agreement and they were

14 also instituting the arbitration provision.

15 Q    Let me ask you this:  As a -- and I looking at

16 Exhibit 2, I think Counsel had brought up, if you looking

17 down at the estimated number of assets -- with regard to the

18 status at the time it was filed, and the information you

19 took at the creditors meeting, do you think that it was a

20 mistake on what was marked as the estimated assets based on

21 the status at that point of a judgment against them, no

22 money coming in from the business and although there was an

23 appeal on file, there was actually no ruling from the court

24 at that point?

25 A    I don't know what they were thinking.  This petition

1  was filed on the 14th, I don't think the schedules were

2  filed until the 31st of that month.

3  Q    I understand.  And the only reason I ask is your

4  counsel pointed to that box trying to say there's some

5  credibility argument with regard to the Debtors based on the

6  fact that now they're here claiming they had $16 million

7  worth of a business that was, and I'm asking you did you

8  feel on the day that this was filed or at the time of the

9  creditors meeting that there was anything wrong with the way

10  they have filled this out based on the situation at the

11  time?

12  A    I can't recall five years ago, but when I'm reviewing a

13  petition, I am very concerned if certain Schedules, amounts

14  on Schedules, amounts on Statement of Financial Affairs, do

15  not correlate and in regard to their tax return, the Debtors

16  tax returns.

17  Q    Do you recall from this case, you came across any of

18  those issues or problems?

19  A    I can't remember back five years ago at that time.

20  Q    And you certainly not making that claim today are you?

21  A    That there -- could you repeat that?

22  Q    You're certainly not making the claim today that there

23  was anything wrong with the way they had scheduled their

24  assets or filed their paperwork today, are you?

25  A    On these issues that we've talked about, no.

WILLIAM WEST -- CROSS BY MR. BECK                 80

1  Q    With regard to the total value of the settlement

2  amount, how was the amount of $2.8 million, $2,868,000

3  arrived at?

4  A    It was negotiated.

5  Q    And how did you arrive at the $426,000, I understand

6  that Mr. Akers gave you the weighting, what was that system?

7  A    He gave us a list of the different Plaintiffs and the

8  value of the cases, the value that he had assigned to each

9  case that was totaled, the proper percentage was applied to

10 each case and then that percentage was applied to the gross

11 settlement.

12 Q    Do you know where he came up with those numbers?

13 A    No, I relied on him for that information.

14 Q    So with regard to the weighting and the amount of money

15 of the $426,000 that is going to the Debtors in this case or

16 to their estate -- I apologize, to their estate, you didn't

17 do any independent investigation as to the weight of that,

18 whether it should be less, whether it should be more of

19 whatever the value was, in this case of the $2.8 million.

20 A    That was Mr. Akers' job.

21 Q    In essence as the Trustee for the Debtor though isn't

22 it your responsibility to make sure that number is correct?

23 A    I relied on counsel's advice.

24 Q    Did he give you any basis as to where the number came

25 from?  Or did he just say here's my list of percentages,

1  good luck?

2  A    From his working on the case for 12-1/2 to 13 years was

3  the basis of his values.

4  Q    I understand the premise behind it, but I guess what

5  I'm asking did he give you any direct evidence of it?  Or

6  did he just say because I've been working on the case for

7  thirteen, I think this is the weight?

8  A    Correct.

9  Q    Now, I believe you testified earlier that there's 13

10 cases that need to approve this Settlement Agreement; is

11 that correct?

12 A    Correct.

13 Q    Within three different districts.  Eight of them have

14 been approved already; is that correct?

15 A    Correct.

16 Q    Do you know how many objections were filed?

17 A    To my knowledge, two.

18 Q    So of the eight that were approved, there was no

19 objection filed, was there?

20 A    Not to my knowledge.

21 Q    And you're not the Trustee in any of those cases, other

22 eight cases.  Well I guess you are the Trustee for the *Kitia*

23 case; is that correct?

24 A    Correct.

25 Q    And that one was approved but there was no objection

1  filed.

2  A    Correct.

3  Q    Is it your understanding that the settlement must be

4  approved in all 13 cases?

5  A    Yes.

6  Q    When you were attending mediation, did you have

7  Exhibit 2 and I'm looking again at Counsel's Exhibits 2, 3,

8  4 or 5 with you?

9  A    Two, three, four and five?

10 Q    Yes, sir.

11 A    I believe so.

12      **THE COURT:**  Sir, you're looking in the book.  He's

13 talking about Mr. Councill's, not your Counsel.

14      **MR. BECK:**  No, no, I'm sorry, I was actually

15 referring to counsel he was correct, Judge.  Looking at 2,

16 3, 4, and 5, the bankruptcy exhibits.

17      **THE COURT:**  The Trustees 2, 3, 4 and 5.

18      **MR. BECK:**  Trustees 2, 3, 4 and 5.

19      **THE COURT:**  Okay good, thank you.

20      **THE WITNESS:**  Yes.  I believe I did.

21 BY MR. BECK:

22 Q    And did you pull those out and take a look at them in

23 deciding whether to accept the $2.8 million?

24 A    Well, one, they were on my laptop, I looked at them

25 electronically and two, I had reviewed this information

1   quite often in this year before the mediation and I was

2   familiar with it.

3   Q    Is there anything specific you could point to in any of

4   those documents that you -- anything specific you considered

5   in saying this is a fair, adequate and reasonable

6   settlement?

7   A    Exhibits 2, 3 and 4?

8   Q    Yes, sir, and 5.

9   A    No.

10  Q    And the reason I ask is because counsel asked you many

11  questions about what you considered and what didn't

12  considered a lot of time was spent on these documents.  You

13  don't remember considering anything specifically about them,

14  just in general you considered the documents in arriving

15  that this is a fair and reasonable settlement?

16         **MR. JONES:**  Judge, I'm assuming other than what he

17  previously testified to?

18         **THE COURT:**  Overruled.

19         **THE WITNESS:**  Yeah, I considered all those things.

20  **BY MR. BECK:**

21  Q    And with regard to Mr. Lawrence's evaluation, do you

22  have any reason to believe that Mr. Councill and

23  Mrs. Councill would not have gone diamond with Amway?

24  A    I have no idea.

25  Q    Did you investigate how close they were to reaching or

1  obtaining a diamond level?

2  A    No.

3  Q    I guess I'm going to test your understanding of the

4  Amway business a bit here, but do you feel that if they were

5  at a diamond level today, their income would higher than

6  what you've seen from the Amway business?

7            **MR. JONES:**  Judge, objection; lack of foundation,

8  calls for speculation.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  I have no idea.

11  **BY MR. BECK:**

12  Q    In evaluating the value of the settlement of the

13  arbitration suit, wouldn't that be something you'd need to

14  know or need to look at as far as their damages from the

15  breach of contract?

16  A    Again, that was -- had been -- I had discussed that

17  with counsel and the focus was put on the attorney's fees

18  number.

19  Q    Did you do any independent investigation on your own as

20  to what an Amway business was, the extent of what amount of

21  money could be made, anything like that, is it willable, is

22  it lifetime, transferable to your children, did you

23  investigate any of those issues?

24  A    I've learned about it from this case.

25  Q    And yet, I believe your testimony is when you were at

1   the mediation came to this settlement those weren't really

2   things that you considered.  You went more along with what

3   counsel was telling you about his attorneys' fees and that

4   kind of thing?

5   A     On the adversary?

6   Q     I'm focusing on now on the breach of contract.

7   A     On the underlying case.  No, no, I wasn't that wasn't

8   the attorneys' fees on the underlying case it was discounted

9   cash flow.

10  Q     And I guess that's what I'm asking.  Did you consider

11  the diamond level or did you consider if they would made

12  what they thought they should be, what their damage would

13  have been?

14  A     No.

15  Q     You just considered what their cash flow was from 1997

16  through what date?

17  A     Of '90 to 2001.

18  Q     '90 to 2001, and especially in Mr. Councill's case, he

19  wasn't actively pursuing the Amway business anymore after

20  that 1997/1998 time; isn't that right?

21  A     Correct.

22  Q     And yet it was still producing at least those numbers

23  that you can verify off Exhibit 11?

24  A     I took that into consideration.

25  Q     Have you seen any evidence that the information

WILLIAM WEST -- CROSS BY MR. BECK                    86

1   provided to Mr. Lawrence and his damage model was

2   inaccurate?

3   A    I just saw his responses.

4   Q    And I believe from what we read into the record what he

5   said is he didn't do anything to verify the numbers.  But

6   have you seen anything specifically that would say the

7   numbers were inaccurate?

8   A    No.

9   Q    And again, you didn't call Mr. Lawrence to find out or

10  to look at what he looked at did you?

11  A    No.

12  Q    Have you ever seen what Mr. Lawrence looked at in

13  coming up with his compilation of $16 million in this case?

14  A    The testimony said that he gave the parties a

15  questionnaire to fill out and he took the numbers off of

16  their questionnaire and plugged into his calculations.

17  Q    Understood.  And I'm asking did you did you ever take a

18  look at that information at least for the Councill's?

19  A    No.

20  Q    Do you have any reason to dispute that that information

21  was accurate?

22  A    No.

23       **(Pause)**

24  **BY MR. BECK:**

25  Q    I understand and know that you testified you've

1  considered a lot of things, can you identify for the court

2  what was, if there is one, what was the most convincing

3  feature/aspect/document that you looked at in deciding that

4  $426,000 about was reasonable and adequate for the

5  settlement of the Councill's claims?  Of the Debtor's claim?

6          **MR. JONES:**  How about the estate's claims?

7  **BY MR. BECK:**

8  Q    The estate's claims?

9  A    There wasn't one specific thing it was a body of work

10 so to speak that went into my conclusion.

11 Q    Is it fair to say that a majority of that body of work

12 came from Mr. Akers?  Or from Amway?

13 A    It's kind of hard to quantify.  From the Debtors, from

14 the general counsel that I first had, Waldron & Schneider,

15 from Mr. Jones, from Brock Akers, those are the only people

16 that were involved in the case with me, so yes.  It would

17 probably be a fair statement in some form or fashion.

18          **MR. BECK:**  I have no further questions, Your

19 Honor.

20          **THE COURT:**  Thank you.  Anything, Mr. Jones?

21          **MR. JONES:**  No, Your Honor.

22          **THE COURT:**  Anything, Mr. Sparacino?

23          **MR. SPARACINO:**  No.

24          **THE COURT:**  All right you can step down, sir.

25     **(Witness steps down.)**

1          THE COURT:  Mr. Jones?

2          MR. JONES:  Judge, that would conclude the

3   Trustee's presentation.

4          THE COURT:  Mr. Sparacino?

5          MR. SPARACINO:  Your Honor, I have no witnesses.

6          THE COURT:  Thank you.  All right, Mr. Beck?

7          MR. BECK:  If I could have just one minute to talk

8   to my client, Your Honor, I may call him.

9       (Pause)

10         MR. JONES:  Judge, if they need five minutes to

11  talk, I've been going since really early, I would love a

12  restroom break.

13         THE COURT:  Let's come back at 20 till 5:00.

14         MR. JONES:  Thank you, Judge.

15         THE COURT:  I had announced before you arrived

16  that I have got to be at a bar meeting tonight at 6:00, so

17  I'm leaving here at 10 till 6:00, finished or not.

18         MR. JONES:  How about 25 till, unless you are

19  going to say we're done.

20         MR. BECK:  I'm not going to call Mr. Councill, so

21  we have no other witnesses.  Mr. West was my only other

22  witness that I had here, that was on my witness list.

23         THE COURT:  Well then we'll take a break until 20

24  till 5:00, and I'll come back and we'll give you a decision.

25         MR. JONES:  Thank you, Judge.

1          **THE CLERK:**  All rise.

2       **(Recess take from 4:27 p.m. to 4:39 p.m.)**

3          **THE COURT:**  Please be seated.

4          All right.  What I have before me is a Motion

5 to Approve a Compromise filed by Mr. West, who is the

6 Chapter 7 Trustee in this case.  And I have an objection

7 that is filed by the Debtor, Mr. and Mrs. Councill.

8          Let me say that, first of all, I'm going to

9 end up approving the compromise.  I don't see any point in

10 keeping that under wraps.  I think the law is really clear

11 that I must do that.  Nevertheless, I find this to be a

12 difficult decision because I am, from a court of equities

13 point of view, extremely sympathetic to Mr. Councill and the

14 plight in which he found himself.

15          So although this is a difficult decision

16 because of those equitable views, the law requires me

17 objectively to review the Trustee's action and there is no

18 question but that the Trustees proposed compromise must be

19 approved under Supreme Court authority.

20          The proposed compromise will provide a

21 100 percent distribution to all of the creditors of the

22 estate and some amount of money, as well, back to the

23 Debtors.  In determining whether to approve the proposed

24 compromise, I'm required to consider whether the proposed

25 compromise is fair and equitable.  Meaning that the senior

1   interest are entitled to full priority over junior interest

2   in this case that occurs.  And that the settlement is

3   reasonable in relation to the likely rewards of the

4   litigation.

5            The four factors to consider under that are,

6   one, the probability of ultimate success should the claim be

7   litigated.  In this case, I've got two separate and in my

8   view independent claims to be litigated.  The first that I

9   will describe is the adversary proceeding having to do with

10  the alleged wrongful conduct by Amway and the conduct of the

11  arbitration provision.

12           In that case, I don't believe that there's

13  much question in my mind, because I'm taking into account

14  not just the testimony today but my entire knowledge of

15  this, which has been pretty extensive through the case, that

16  Amway will be found liable for its conduct subject to a

17  defensive issue, which I'll get to in a minute.  But that

18  the damages from Amway's conduct will be extremely difficult

19  to demonstrate.

20           Those damages are too difficult to

21  demonstrate because their difficult to quantify and because

22  the Debtors may have ended up filing bankruptcy at a stage

23  when the actual consequences of the bankruptcy filing while

24  not themselves be actionable.  And a lot of the damages stem

25  out of that actual bankruptcy filing.

1              One of the things that we did early on in

2   that case was issue an opinion, denying Amway's Motion to

3   Dismiss under the Noerr-Pennington Doctrine.  I really do

4   take that into consideration pretty heavily in my

5   determination today as to what will ultimately happen in

6   terms of liability, not because I don't think their liable,

7   but because I think that defense is something that has to be

8   considered.

9              I have a ruled the defense, but I think you

10  have to -- I have to sit here and say what's the probability

11  that I'm ultimately going to get overruled on that

12  overruling of the defense?  And when you make one of those

13  decisions, you have to decide, you know, is that a decision

14  that was an obvious call by the court or was that a more

15  nuisance decision.  That was really difficult decision.  And

16  I don't think I've reach any decision where I don't think

17  the probabilities are greater than 50/50 that it will be

18  upheld on appeal, but that one is right at the margin of

19  saying I had a difficult call and there is a very

20  substantial possibility that that gets reversed on appeal.

21             I don't know what the percentages are, but

22  greater than 35 percent and maybe, you know, right up around

23  45 percent that my Noerr-Pennington decision gets reversed.

24  It was a hard decision.  If that gets reversed, that lawsuit

25  is worth zero.

1          So although I think that what Amway did was

2    wrong and I know they haven't been able to fully defend

3    themselves, but I read a lot and I think what they did was

4    wrong.  They may have a defense under Noerr-Pennington that

5    I'm wrong about and the damages from attorney's fees are

6    essentially zero, it was a contingency fee case, which puts

7    us really into the intangible damages that were inflicted on

8    the Councills, which are extraordinarily difficult to proof

9    and which may fall as much out of the filing of bankruptcy

10   as out of the arbitration.  And I don't really have any

11   amount in the record as to what those are worth.

12          With respect to the main underlying case, and

13   the probability of ultimate success, that is the '98 case,

14   which will eventually go to trial, I found that the

15   Trustee's business judgment as to the value of that

16   litigation was plainly within the range of reason.  And

17   there were two things he testified to that I found somewhat

18   overwhelming.  One was that his evaluation of the damages

19   model was that it was practically worthless.  That

20   evaluation was challenged by Mr. Beck appropriately when he

21   said, "You know, look, you can't just say that, tell me what

22   you base it on," and we then went through line by line a

23   cross-examination of that expert witness.

24          It was a devastating cross-examination.  I

25   don't think anyone could have sat through listening to that

1  and not decided it was a really bad cross-examination.  And

2  the Plaintiffs are going to be stuck with that.  I don't

3  care whether they hire a new expert or whatever they do,

4  they're going to be stuck with that.

5          And you can credit it to the fact perhaps

6  that Amway had good lawyers or you can credit it to the fact

7  that the expert was bad and it really doesn't matter.  It

8  was a devastating cross-examination.

9          And so for Mr. West to conclude that he

10  couldn't rely on that expert report given the cross-

11  examination is something that can't be seriously be

12  challenged.

13          Second, Mr. West, in applying the Amway

14  damages model and comparing it to the tax return, I found

15  that interesting, but I think Mr. Beck's point is pretty

16  right that that's going to have its own biases built in.

17  Then went off on a bit of a tangent which came into the

18  record, which is I've been a CPA for 30 years, I've seen

19  businesses of this size and I have to use my judgment as to

20  what's a credible damages model.  And his own personal

21  judgment I gave quite a bit of weight to that he just didn't

22  think it was credible to have the bigger model and he found

23  the smaller model -- forgetting whether it came from a bias

24  source or not, much more consistent with what his own belief

25  was.  And then looking at the data that comes in on an

1   unchallenged basis, I have to agree with Mr. West that the

2   damages are probably less than the amount of the settlement.

3           Number Two, is the complexity expense in likely

4   duration of litigating the claim.  I'm going to mix into

5   this the allocation.  This is one of the more complex claims

6   I've seen.  It is difficult to deal with all of the

7   intricacies of the Amway system.  We have two different

8   lawsuits.  We have two different courts that are going to

9   try those lawsuits.  The original claim was filed 12 years

10  ago.  It's going to go on a lot longer, too.  This isn't

11  going to be resolved at a trial level.  This will get fought

12  tooth and nail until it goes all the way up back to the

13  Fifth Circuit.  There's a lot left in the case.  It's gone

14  on a long time.  And I believe will be very complex, very

15  expensive and very lengthy.

16          Part of the complexity deals with the fact

17  that we have multiple Plaintiffs, each of whose damages will

18  need to be independently evaluated.  So this is sort of a

19  mixture of one and two and that is how do we allocate the

20  $2.8 million amongst the various Debtors?

21          I thought what Mr. West did was right.  And I

22  understand the challenge to it, which is, you know, why are

23  you just relying on Mr. Akers, but I think the answer to

24  that is right, too.  He's the one that actually knows the

25  most about this in the whole world.  He's worked on it for

1  13 years.  He had no incentive to push numbers towards one

2  Plaintiff versus another Plaintiff.  He shouldn't personally

3  care about that.  He's the Trustee's lawyer.  The Trustee

4  asked him for an honest evaluation, he gets one.

5          I don't think the Trustee in the context of a

6  9019, which is intended to determine whether a settlement is

7  reasonable, needs to now say, "Well, you know, Mr. Akers,

8  let me go into each case individually and let me create

9  separate damages models."  I think he does have the right

10  and maybe the duty to rely on such an analysis by Mr. Akers.

11  So I think all that was reasonable.

12          Number three is the difficulties of

13  collecting a judgment rendered from the litigation.  I don't

14  think the Trustee even relies on this.  There's no evidence

15  of that.  I find that this favors the settlement because I

16  think Amway would pay, if as in when a judgment were

17  ultimately rendered.

18          And finally, all other factors relevant to a

19  full and fair assessment of the wisdom of the compromise:

20  What I'm considering under this factor is not only the

21  overall breath of knowledge I have in this case, and frankly

22  -- I know this is going to be difficult for Mr. Councill

23  since I am ruling against him today -- I know I'm

24  sympathetic to Mr. Councill.  I know I feel like he got

25  wronged here and so as I view this compromise, I'm viewing

1   it with a bias in his favor because that's just where I am.

2            And I do take that into consideration in

3   terms if I am so how saying I want to get this over

4   prematurely or doing anything like that?  But I know my own

5   feelings about it and my own sympathies and I suspect this

6   is hard for Mr. Councill to believe where I am, but that is

7   where I am.  And I do take that into consideration.

8            Second thing is, I saw substantial complaints

9   by Mr. Councill about the quality of Mr. Akers' work.  That

10  plays a role in my decision and I want to explain why.

11  First, to the extent that Mr. Akers did bad work, and I'll

12  just assume that for the purposes of these findings.  Number

13  one that did not get scheduled any claim against Mr. Akers

14  for pre-petition bad work.  That is ambiguously gone under

15  existing Fifth Circuit law.  So if Mr. Akers did a bad job,

16  there's no claim left against Mr. Akers if it arose prior to

17  the date of the petition.

18            Second, if Mr. Akers did a bad job, the

19  Trustee is stuck with that bad job.  That actually favors,

20  doesn't disfavor the compromise.  If he missed deadlines, if

21  he didn't do what he was suppose to do, if he blew the

22  litigation in some stage.  If he filed it too late, all of

23  the different allegations that are in Mr. Councill's letter,

24  the Trustee takes his case as he finds it.  And he finds it

25  with that alleged bad lawyering by Mr. Akers.

1          If the allegation -- and most of the

2     allegations that I saw pertained to allegations that

3     Mr. Akers did a bad job prior to the time that the

4     bankruptcy was filed.  I'm not finding he did a bad job.  I

5     am just assuming that based on the allegations, but think it

6     favors the settlement.

7          To the extent that Mr. Akers did a bad job

8     after he was retained by Mr. West, we're not reaching that

9     determination.  If he did a bad job after he was retained by

10    Mr. West, it does favor the settlement because Mr. West

11    needs to take less to recognize that.  It also means the

12    ultimate result to Mr. Councill will ultimately greater if

13    we do determine that Mr. Akers did a bad job after the case

14    was file.

15         Again, we are not in a position to and will

16    be considering whether he did a good job before he was

17    retained by Mr. West.  But we certainly couldn't have

18    anticipated and I've seen no evidence at this stage that

19    Mr. Akers did a bad job after Mr. West retained him.  But if

20    he did, that'll go into his fees, if his fees are less,

21    Mr. Councill gets paid more, so I'm not foreclosing that in

22    anyway.

23         Taken as a whole, settling this claim for

24    this amount of money is well within the range of discretion

25    in the business judgment that the Trustee has, I have no

1    hesitancy that the right legal call is to approve the

2    compromise.

3                At the beginning of today's hearing I

4    indicated that the Order would make clear that none of

5    Mr. Councill's post-petition claims are settled by this.  I

6    am going to require an Amended Order to be submitted by the

7    Trustee that is consistent with that.  If Amway doesn't

8    agree to settle on that basis, then they don't agree and

9    there won't be a settlement.

10               I can't force Amway to settle.  But I'm not

11   going to force Mr. Councill to settle either.  I can't do

12   that either.  So to the extent that he has claims that arose

13   post-petition, the Order should include a provision that

14   either Amway or Mr. Councill can come to me to get a

15   determination of whether a claim arose pre- or

16   post-petition.

17               I don't want to put anybody in a position --

18   I don't want to put Amway in a position where they don't get

19   the benefit of the bargain.  I don't want to put

20   Mr. Councill in the position where he has to go file the

21   claim then perhaps be held in contempt of court.  Neither of

22   those is fair so I'm going to retain jurisdiction to

23   determine whether claims have been released or not and to

24   determine whether they are pre- or post-.

25               Hopefully you-all can do that in some sort of an

1   agreed motion for a determination rather than a lawsuit.

2   You can put that in the Order, but I will reach that

3   determination if, as, and when I need to.

4       **MR. JONES:**  And Judge, just now I'd like to get

5   Mr. Beck's input is what I'm hearing you say, and I want to

6   make sure we're all on the same page is that prior to any

7   claim being asserted, a motion will be filed, or was it

8   after the fact?

9       **THE COURT:**  I think Mr. Councill would be foolish

10  to do it any other way so that's why I want to give him the

11  option to do that.

12      **MR. JONES:**  Okay.

13      **THE COURT:**  I'm enjoining him from bringing the

14  estate claims.  But if he has a claim that he's 100 percent

15  sure is his and not an estate claim and he brings it at the

16  risk of being held in contempt, I can't enjoin him and I

17  won't enjoin him for bringing his own claims.  I'm just

18  telling him and your probably better off not being in

19  contempt of court.

20      **MR. JONES:**  I understand, Judge.

21      **THE COURT:**  I'm just giving him that option, yeah,

22  so -- but I don't think I have the authority to enjoin him

23  from bringing his own claims.

24          Under 105, just to make the record really

25  complete, I have done that before, when I see a Debtor that

1  frivolously brings claims repeatedly that are actually

2  claims of the estate and I'll say, "No, you're violating our

3  Order.  As a punishment for contempt, you now need to come

4  back here to get advance approval."

5           I got no indication that that's who I got

6  here.  No indication that Mr. Councill will do anything

7  wrong and I'm not going to enjoin him from doing something

8  that's right to stop him from doing something that's wrong.

9           But I'm going to give him the freedom to come

10  and do that if that's what he chooses to do.  And I hope

11  that he and Mr. Beck will talk a long time about what is and

12  what isn't pre- and post-.  And perhaps talk to

13  Mr. Sparacino, as well, and find a way to put an end to

14  this.  But if he has a claim, he has a claim.

15           Mr. Jones, can you get that submitted in the

16  next 14 days?

17      **MR. JONES:**  Can I look to someone?

18      **THE COURT:**  No, I don't even need them to agree.

19  They don't have to agree.

20      **MR. JONES:**  I'm sorry, Your Honor.

21      **THE COURT:**  Mr. Sparacino, doesn't need to agree.

22  He doesn't sign the deal, he doesn't sign it.

23      **MR. JONES:**  Well Judge, I agree that that's a

24  statement of fact.  It also, I think, is part of my job

25  given -- I negotiated with 13 different lawyers and I want

1    to circulate that Order.

2            **THE COURT:**  No, they don't get a say in the Order.

3    It's my Order.  I want you doing what I've told you to do.

4    If you don't want to do it, I'll write it on my own.

5            **MR. JONES:**  No, Judge, I'll do it.

6            **THE COURT:**  It doesn't need to get circulated to

7    anybody.  You've do what I've told you to do.

8            **MR. JONES:**  Fourteen days will be great.

9            **THE COURT:**  Thank you.  We're in adjournment.

10           **THE CLERK:**  All rise.

11       (Proceeding adjourned at 4:57 p.m.)

12

13   *I certify that the foregoing is a correct transcript from*

14   *the electronic sound recording of the proceedings in the*

15   *above-entitled matter.*

16   */s lmartin*

17   _____

18   *JUDICIAL TRANSCRIBERS OF TEXAS, INC.*

19   *JTT JOB/INVOICE # 28609*

20   *DATE:  OCTOBER 20, 2010*

21

22

23

24

25                        * * * * *